EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Olga Domínguez Castro Sandra J. Guzmán Hernández, Militza López Mateo, Carlos Rivera Figueroa<br><br>      Recurridos<br><br>                v.<br><br>Gobierno del Estado Libre Asociado de Puerto Rico, Secretario de Justicia, Honorable Luis Fortuño, Gobernador del Estado Libre Asociado de Puerto Rico, Departamento de la Familia y Junta de Reestructuración y  Estabilización Fiscal<br><br>      Peticionarios | Certiorari<br><br>2010 TSPR 22<br><br>178 DPR \_\_\_\_ |

Número del Caso:    CT-2009-4
                    CT-2009-5
                    CT-2009-6
                    CT-2009-9

Fecha: 19 de febrero de 2010

Abogados de la parte peticionaria:

              Lcdo. Eliezer Aldarondo Ortiz
              Lcda. Rosa Campos Silva
              Lcdo. Eliezer A. Aldarondo López
              Lcdo. Simone Cataldi Malpica

Abogados de la Parte Recurrida:

              CT-2009-9
              Lcda. Vivian Negrón Rodríguez
              Lcda. Jeanette Rodríguez Claudio
              Lcdo. José R. Pérez Ayala
              CT-2009-6
              Lcdo. Arcelio Maldonado Avilés II
              CT-2009-4
              Lcdo. David Noriega Rodríguez
              Lcda. Myrna E. Cruz Colón
              Lcdo. Frank Zorrilla Maldonado
              CT-2009-5
              Lcda. Sylvia M. Soto Matos
              Lcda. Evelyn López Díaz
              Lcda. Jinelly Laureano Vázquez

Materia: Interdicto Preliminar, Permanente y Sentencia Declaratoria

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Olga Domínguez Castro, Sandra J. Guzmán Hernández, Militza López Mateo, Carlos Rivera Figueroa<br>Recurridos<br><br>v.<br><br>Gobierno del Estado Libre Asociado de Puerto Rico, Secretario de Justicia, Hon. Luis Fortuño, Gobernador del Estado Libre Asociado de Puerto Rico, Departamento de Justicia, Departamento de la Familia y Junta de Reestructuración y Estabilización Fiscal<br>Peticionarios | CT-2009-4<br>CT-2009-5<br>CT-2009-6<br>CT-2009-9 |
|---|---|

Voto Particular del Juez Asociado señor Rivera Pérez al que se unen los Jueces Asociados señor Martínez Torres, señor Kolthoff Caraballo y la Jueza Asociada señora Pabón Charneco

San Juan, Puerto Rico, a 19 de febrero de 2010.

La controversia ante nos no comenzó con la aprobación de la Ley Núm. 7 de 9 de marzo de 2009, 2009 L.P.R. 7. Gira alrededor de un período de tiempo de cinco (5) años; esto es, los presupuestos de los años 2005-2006, 2006-2007, 2007-2008, 2008-2009 y 2009-2010. La presente controversia está relacionada con tres (3) casos atendidos y resueltos previamente por este Tribunal. A saber: Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006); Díaz Saldaña v. Acevedo Vilá, 168 D.P.R. 359 (2006); y Romero Barceló v. E.L.A., 169 D.P.R. 460 (2006). Veamos cómo este Tribunal ha atendido durante esos años el asunto y las controversias surgidas alrededor de la crisis fiscal de la Rama Ejecutiva.

I

El 30 de junio de 2005, la Asamblea Legislativa aprobó la Resolución Conjunta de la Cámara Núm. 445, que contenía el Presupuesto General de Gastos del Gobierno de Puerto Rico proyectado para el año fiscal 2005-2006. Al día siguiente, esta pieza legislativa fue presentada al Gobernador para su evaluación correspondiente. El Gobernador vetó en su totalidad, por inacción, tal medida según establece el Art. III, Sec. 19 de la Constitución de Puerto Rico. 1 L.P.R.A. Art. III, Sec. 19. Como consecuencia se activó el Artículo VI, Sec. 6 de nuestra Constitución. 1 L.P.R.A. Art. VI, Sec. 6. Esto es, las partidas de gastos consignados en el Presupuesto General para el año fiscal 2004-2005, contenidas en la Resolución conjunta de la Cámara Núm. 927 de 30 de junio de 2004, en adelante R.C. 927, continuaron rigiendo para el año fiscal 2005-2006.[1]

El Gobernador, Hon. Aníbal Acevedo Vilá, aprobó la Orden Ejecutiva Núm. 58 de 30 de agosto de 2005, Boletín Administrativo Núm. OE-2005-58, decretando ciertos ajustes a los desembolsos con cargo al Fondo General para el año fiscal 2005-2006. La referida Orden Ejecutiva disponía que **"los recursos disponibles para el año fiscal 2005-2006 no basta[ban] para cubrir las asignaciones presupuestarias vigentes"**.[2] Para balancear el presupuesto de ese año fiscal

---

[1] Presidente de la Cámara v. Gobernador, 167 D.P.R. 149, 151-152 (2006).

[2] Íd., pág. 152. (Énfasis nuestro).

el Gobernador, Hon. Acevedo Vilá, entendió que había que reducir el presupuesto de la Cámara de Representantes por $6 millones menos que lo asignado para el mismo propósito mediante la R.C. 927; el presupuesto del Senado por aproximadamente $4,500,000 menos que lo asignado por la referida Resolución Conjunta; y la partida correspondiente a las Actividades Conjuntas de la Asamblea Legislativa fue reducida aproximadamente a la mitad. La R.C. 927 proveía $21,600,000. Por tal concepto fue reducido a $10,780,000.[3]

Ambos Presidentes de las Cámaras Legislativas y la Superintendente del Capitolio presentaron sendas acciones ante el Tribunal de Primera Instancia solicitando que se dictara sentencia declaratoria e injunction en contra del Gobernador, Hon. Acevedo Vila, el Secretario de Hacienda y la Directora de la Oficina de Gerencia y Presupuesto. Alegaron que el Gobernador había violado el Art. VI, Sec. 6 de nuestra Constitución, *supra*, y el principio de separación de poderes. Solicitaron que se declarara inconstitucional la actuación del Gobernador y que se le ordenara certificar como disponible para el año fiscal 2005-2006 un presupuesto idéntico al del año fiscal anterior, hasta que se aprobara un nuevo presupuesto. El Tribunal de Primera Instancia, Sala Superior de San Juan, consolidó las acciones de la Cámara de Representantes y de la Superintendente del Capitolio.[4] La acción del Senado fue

---

[3] *Íd.*, pág. 153.

[4] *Íd.*, págs. 153-154.

atendida por otra Sala Superior de San Juan del foro primario.[5]

En el caso consolidado de la Cámara y la Superintendente del Capitolio, el Gobernador, Hon. Acevedo Vilá, presentó ante el Tribunal de Primera Instancia una "Moción en Solicitud de Sentencia Sumaria a Favor de los Funcionarios Demandados". En dicho escrito, alegó como hecho incontrovertido que mediante la ya mencionada Orden Ejecutiva realizó ajustes a los desembolsos de fondos autorizados con cargo a las asignaciones de la Cámara de Representantes a $41,000,000 para el año fiscal 2005-2006. Adujo también, que el contexto histórico en el que se desenvuelve el caso reúne dos (2) eventos noveles, estos son: la falta de aprobación de asignaciones presupuestarias para un año fiscal; **"y la existencia de un presupuesto deficitario". Sobre este último, el Gobernador aludió en varias ocasiones a la existencia de una situación deficitaria crítica.** Más aún, señaló que "[l]a Asamblea Legislativa no puede **pretender excluirse del grave problema fiscal que afronta el Gobierno** arguyendo que cualquier ajuste que se realice en los desembolsos con cargo a sus asignaciones debe ser vedado". (Énfasis nuestro).

El Tribunal de Primera Instancia, Sala Superior de San Juan, por voz del Hon. Carlos S. Dávila Vélez, Juez, dictó sentencia sumaria y declaró con lugar ambas acciones. El foro primario resolvió que la actuación del Gobernador,

---

[5] *Íd.*, pág. 155.

Hon. Acevedo Vilá, era ilegal por violar la doctrina de separación de poderes y por constituir una concentración de poder indebida en la Rama Ejecutiva, la cual no surge expresamente de la Constitución. Por ello, emitió un injunction permanente en contra de los demandados para que cesaran y desistieran de reducir unilateralmente las partidas presupuestarias vigentes de la Legislatura. Insatisfecho, el Gobernador acudió ante el Tribunal de Apelaciones.[6]

Por su parte, en el caso del Senado, luego de la vista oral argumentativa el Tribunal de Primera Instancia le ordenó al Gobernador, Hon. Acevedo Vilá, que sometiera un escrito exponiendo su posición sobre el recurso. El Gobernador presentó un escrito intitulado "Moción de Sumaria a Favor de los Funcionarios". Allí, alegó como hecho incontrovertido, *inter alia*, que **"los recursos disponibles para el año fiscal 2005-2006 no eran suficientes para cubrir las asignaciones presupuestarias que habían quedado o advenido vigentes; que a raíz de esa situación deficitaria, y de las necesidades apremiantes e intereses del servicio"**. El Gobernador aprobó la Orden Ejecutiva Núm. 58, mediante la cual ajustó los desembolsos de fondos que se hacen con cargo a las asignaciones del Fondo General vigentes para el año 2005-2006. De esa manera pretendió ajustar los desembolsos con cargo a la

---

[6] Presidente de la Cámara v. Gobernador, 167 D.P.R. 149, 154 (2006).

partida correspondiente a la Asamblea Legislativa en $10,780,000 para el año fiscal 2005-2006.

El Tribunal de Primera Instancia, Sala Superior de San Juan, por voz del Hon. Oscar Dávila Suliverez, Juez, dictó sentencia sumaria a favor del Gobernador y demás funcionarios demandados y en contra del Senado. **Concluyó, que ante un déficit presupuestario el Primer Ejecutivo no podía autorizar el desembolso de todos los gastos para el funcionamiento del Gobierno, sino que estaba obligado a procurar que el presupuesto general estuviese balanceado, y debía atender los intereses del servicio público y las necesidades apremiantes del País, según disponen las Secciones 6, 7 y 8 del Art. VI de nuestra Constitución** y la Sección 2 de la R.C. 927. Concluyó que el Gobernador podía ajustar las asignaciones presupuestarias del Senado sin que ello vulnerara la doctrina de separación de poderes.[7]

Nótese, sin embargo, que en ambos casos el Tribunal de Primera Instancia determinó como hecho incontrovertido la existencia de una crisis fiscal en la Rama Ejecutiva. En el caso de la Cámara de Representantes señaló palmariamente: **"[e]sta es una crisis que debe ser enfrentada por las tres ramas...",** mientras que en el caso del Senado de Puerto Rico el foro primario indicó que **"[l]os recursos disponibles, según estimados por la Rama Ejecutiva para el Año Fiscal [sic] 2005-2006, no son suficientes para cubrir las asignaciones presupuestarias**

---

[7] *Íd.*, págs. 155-156. (Énfasis nuestro).

**que han quedado o advenido vigentes**... Los ingresos no son suficientes para costear los gastos del presupuesto de este año". (Énfasis nuestro).

Así las cosas, se solicitó ante nos la certificación de ambos casos (tres (3) causas de acción de autos)[8] y acordamos expedir. Concluimos que ambos casos tenían cuestiones similares de hechos y de derecho. Todas las partes presentaron sus alegatos.

Nuevamente, en su alegato ante nos, el entonces Gobernador, Hon. Acevedo Vilá, alegó en síntesis, que existía un déficit presupuestario y que por tal razón tenía la obligación de cuadrar el presupuesto para atender las necesidades del País. En apoyo de su contención, arguyó que existía **un estado de alarma debido a una crisis económica donde la economía de Puerto Rico y su crédito se encontraban en peligro porque la Legislatura no le aprobó el presupuesto necesario. También, destacó que era de conocimiento general que el Gobierno de Puerto Rico hubiese acumulado a través de varias décadas un déficit estructural que sobrepasa mil (1,000) millones de dólares.**

El 19 de diciembre de 2005, el Gobernador, Hon. Acevedo Vilá, solicitó el desistimiento del recurso de certificación que él presentara y la desestimación del recurso de la misma naturaleza presentado por el Senado por ser ambos recursos, alegadamente, académicos. Las Cámaras

---

[8] *Íd.*, págs. 154-156.

Legislativas y la Superintendente del Capitolio se opusieron a tal petición.[9]

El Gobernador, Hon. Acevedo Vilá, promulgó, el 16 de diciembre de 2005, una Orden Ejecutiva, Boletín Administrativo OE-2005-78, reponiendo la cantidad de dinero que originalmente redujo a los presupuestos de la Asamblea Legislativa. Con tal actuación revirtió los efectos de su Orden Núm. 58, la cual creó la referida controversia. El Gobernador alegó, para sostener su argumento de academicidad de ambos recursos de certificación, que tres (3) meses y diez y seis (16) días después de haber emitido la Orden Ejecutiva Núm. 58, los recaudos del Gobierno habían sobrepasado las proyecciones de ingresos estimados para el año fiscal 2005-2006. Informó que dicho aumento de los ingresos se debió a la creciente actividad económica y a las medidas implementadas sobre fiscalización gubernamental.[10]

Sobre tal asunto concluyó este Tribunal que "ya la Asamblea Legislativa no requiere nuestra intervención para procurar la reposición de sus presupuestos. **Además, parece evidente que la condición fiscal del País no es la misma que existía cuando el Gobernador decidió reducir los aludidos presupuestos. Es decir, la controversia que llegó ante nosotros ya no es un obstáculo legal ni práctico para el normal desenvolvimiento de ambas ramas políticas de**

---

[9] *Íd.*, pág. 156.

[10] *Íd.*, pág. 158.

**nuestro Gobierno".** Añadió este Tribunal, que "debido a las particularidades de la controversia que se nos presentó, **entendemos que no existe una probabilidad razonable de [sic] vuelva a repetirse.** Es decir, su recurrencia requeriría que existiera un tranque en el proceso de formulación y aprobación del presupuesto, en circunstancias de crisis fiscal, y que el Primer Mandatorio vuelva a reducir unilateralmente los presupuestos de otra Rrama [sic] del Gobierno. En el pasado siglo nunca se nos presentó un trasfondo fáctico análogo. Resulta, pues, muy especulativo concluir que una controversia idéntica a ésta volverá a suscitarse".[11]

Este Tribunal concluyó en tal forma, a pesar de que el Gobernador, Hon. Acevedo Vilá, alegó inicialmente que la crisis fiscal de la Rama Ejecutiva se debía, en parte, a que la Rama Legislativa no le había aprobado un presupuesto para el año fiscal 2005-2006, y que posteriormente, al solicitar el desistimiento y desestimación de los referidos recursos de certificación, se contradijo, cambió diametralmente su posición y arguyó que los recaudos del Gobierno habían sobrepasado las proyecciones de ingresos estimados para ese mismo año fiscal 2005-2006.[12] Este Tribunal no exigió prueba alguna al entonces Gobernador para sostener su nueva postura.

---

[11] Presidente de la Cámara v. Gobernador, 167 D.P.R. 149, 159 (2006). (Énfasis nuestro).

[12] Íd., pág. 158.

El Tribunal razonó lo siguiente: "pesa sobre nuestro análisis el hecho de que la ocasión no es la propicia para un pronunciamiento nuestro".[13]  Concluyó que "[l]a situación gubernamental actual amerita que estas Ramas trabajen en conjunto para resolver asuntos de mayor trascendencia e importancia para el bienestar del pueblo de Puerto Rico. El proceso político debe continuar su cauce".[14]  **Le impartieron total y absoluta deferencia al referido proceso realizado por las ramas políticas del gobierno.**

Este Tribunal concluyó, además, en aquella ocasión que **"[e]n ausencia de circunstancias que ameriten la intervención judicial, no estamos en posición de emitir directrices con el propósito de guiar al Ejecutivo y al Legislativo en la encomienda que los electores le han delegado para los años restantes de este cuatrienio.  Todas estas consideraciones ameritan nuestra prudencia y abstención en estas circunstancias no aptas para le intervención judicial".[15]**

Así pues, este Tribunal anuló los autos de certificación expedidos en los casos de <u>Hon. José Aponte Hernández v. Hon. Aníbal Acevedo Vilá y otros</u>, CT-2005-06; y <u>Senado de Puerto Rico v. Hon. Aníbal Acevedo Vilá y otros</u>, CT-2005-08; y ordenó su archivo.[16]  El entonces Juez

---

[13] *Íd.*, pág. 161.

[14] *Íd.*

[15] *Íd.*, págs. 161-162.  (Énfasis nuestro).

[16] <u>Presidente de la Cámara v. Gobernador</u>, 167 D.P.R. 149, 162 (2006).

Asociado, señor Fuster Berlingeri concurrió por escrito. Disentimos sin opinión escrita. La Juez Asociada, señora Rodríguez Rodríguez disintió con Opinión escrita.

La distinguida Juez Asociada, señora Rodríguez Rodríguez disintió de la determinación de la mayoría de desestimar por académicos ambos recursos de certificación por la actuación unilateral del Gobernador, Hon. Acevedo Vilá, de cesar la conducta que originalmente dio base al litigio y al restaurarle el presupuesto a las Cámaras Legislativas y a la Superintendencia del Capitolio. **Su inconformidad se asentó sobre la ausencia de garantía de que el entonces Gobernador no habría de incurrir en la misma conducta en el futuro.[17]**

No había garantía de que el Gobernador, Hon. Acevedo Vilá, no repitiera tal actuación porque este Tribunal no le exigió la presentación de prueba para sostener su moción de desistimiento y de desestimación por ser alegadamente académicos ambos recursos de certificación. **No le exigió la presentación de prueba sobre su alegación de que "los recaudos del Gobierno habían sobrepasado las proyecciones de ingresos estimados para el año fiscal 2005-2006". Esta prueba era vital para que este Tribunal se asegurara de que no iba a repetirse esta controversia en un futuro. No obstante, este Tribunal se conformó con aceptar como cierta sólo la alegación del entonces Gobernador, Hon. Acevedo Vilá, basada en su Orden Ejecutiva del 16 de diciembre de**

---

[17] *Íd.*, pág. 165.

**2005, desnuda de prueba alguna. A la mayoría le satisfizo y entendió como "evidente" la alegación de que la condición fiscal del Gobierno no estaba en crisis, en clara y abierta contradicción con lo dictaminado poco tiempo antes por los Jueces Superiores, Hon. Dávila Vélez y Hon. Dávila Suliveres, como hecho incontrovertido y a solicitud del propio Gobernador, Hon. Acevedo Vilá, de que existía una deficiencia fiscal en el presupuesto del año 2005-2006. No exigió prueba de la veracidad de tal alegación para concluir como lo hizo e indicar que la referida controversia no era un obstáculo para el normal funcionamiento de la Rama Ejecutiva.** No le exigió al entonces Gobernador la presentación de prueba de que la referida controversia se hubiere disuelto y no iba a repetirse porque la Rama Ejecutiva contaba con los recursos económicos necesarios para su normal funcionamiento y la prestación de servicios a la ciudadanía.

No obstante, los disidentes de aquel momento, el que suscribe y la Juez Asociada señora Rodríguez Rodríguez, no señalaron que los servicios gubernamentales a los que tiene derecho la ciudadanía y a ser prestados por la Rama Ejecutiva merecían de "un Tribunal que examinara a cabalidad sus planteamientos a la luz de la prueba que en su momento se presentara, y no que se atendieran sus reclamos mediante una decisión que valida, **cual sello de goma,** los argumentos del Estado".[18] La falta de constancia

---

[18] Op. Disidente de la Juez Asociada, señora Rodríguez Rodríguez, pág. 2.

de la mayoría en aquel caso tampoco produjo en el ánimo de los disidentes de entonces el **"entender tal vez cuando, desde la orilla, observamos el flujo y reflujo de la marea"**,[19] refiriéndose a los miembros y compañeros de funciones de la mayoría. Tampoco le adscribieron a éstos **"despreocupación"** de que la ciudadanía no recibiera los servicios públicos a que tiene derecho de la Rama Ejecutiva.

La actuación de este Tribunal de anular los referidos autos de certificación, oportuna y debidamente expedidos, produjo la indeseable anomalía de dejar sin revisión judicial dos (2) dictámenes del Tribunal de Primera Instancia, Sala Superior de San Juan, a través de dos (2) de sus jueces, totalmente contradictorios sobre un mismo asunto y controversia de hecho y de derecho.

**La claudicación de este Tribunal de su ministerio, deber y obligación constitucional por su falta de intervención en ese caso, junto a otras acciones de la Rama Ejecutiva que no es propio de nosotros analizar, dio margen al inicio de la más grave crisis fiscal que vive Puerto Rico en la actualidad, que está directamente relacionada con muchos de los asuntos que actualmente nos enfrentamos en el caso ante nos y que las Opiniones Disidentes de hoy postulan que requieren en la actualidad de la presentación de prueba.** Muy respetuosamente no compartimos tal criterio. Sin embargo, en ese caso del pasado cuando era

---

[19] *Íd.*, pág. 5.

imprescindible la presentación de prueba, como explicamos previamente, la mayoría de entonces no lo hizo, sin ocurrírsele, repetimos, a ninguno de los disidentes de entonces adscribirle a aquella mayoría que fungían **"cual sello de goma"** del Ejecutivo o que actuaban en forma **"despreocupada"** ante las necesidades de cientos de miles de ciudadanos.

**La mayoría declinó su jurisdicción en ese caso cuando era necesario delimitar los contornos de la Constitución de Puerto Rico en cuanto a los poderes del Gobernador para conjurar los graves problemas fiscales de la Rama Ejecutiva.** Las actuaciones del entonces Gobernador afectaban directamente el funcionamiento y operación de la Legislatura, que es, según nuestro esquema constitucional democrático, la rama de gobierno donde se formula la política pública que convierte en realidad las aspiraciones del Pueblo de Puerto Rico, plasmadas en las elecciones generales. Las actuaciones del entonces Gobernador también afectaron directamente el principio de gobierno representativo que es el eje de nuestro sistema legislativo, interviniendo impropia e indebidamente con el mandato democrático expresado en las urnas, a tenor con los valores de esa voluntad colectiva y con el bienestar de cientos de miles de puertorriqueños.

II

El 26 de abril de 2006, el Gobernador, Hon. Acevedo Vilá, emitió su Orden Ejecutiva Núm. 10, Boletín Administrativo OE-2006-10, para exponer que "a pesar de los

esfuerzos realizados por la Rama Ejecutiva, los fondos estimados disponibles para cerrar el año fiscal 2005-2006 resultarían insuficientes para cubrir las operaciones del Gobierno para dicho periodo, según había informado el Secretario de Hacienda".[20] **Sostuvo que, de continuar efectuándose de manera corriente los desembolsos correspondientes a todas las entidades que se nutrían del Fondo General, era inminente el cierre del gobierno antes de que culminara el año fiscal 2005-2006.**[21] Expresó que resultaba indispensable mantener un nivel mínimo de funcionamiento gubernamental que incluyera la operación de los elementos esenciales de las agencias de seguridad y de salud públicas, de manera que se pudiera preservar la razón de estado, la salud y la seguridad del pueblo.[22]

El Gobernador, Hon. Acevedo Vilá, instruyó al Secretario de Hacienda a autorizar los desembolsos con cargo al Fondo General de acuerdo con determinadas directrices incorporadas en la referida Orden Ejecutiva. Ordenó que se le desembolsara a la Oficina del Contralor de Puerto Rico sólo el setenta y cinco (75) por ciento de los gastos de nómina proyectados para mayo y junio de 2006. Le redujo en igual proporción los demás gastos operacionales para el mismo periodo.[23]

---

[20] _Díaz Saldaña v. Acevedo Vilá_, 168 D.P.R. 359, 360 (2006).

[21] _Íd._, pág. 360.

[22] _Íd._

[23] _Íd._, págs. 360-361.

El 28 de abril de 2006, el Contralor presentó un recurso de *mandamus* ante nos contra el Gobernador y el Secretario de Hacienda a escasamente dos meses y medio de haberse resuelto el caso de <u>Presidente de la Cámara v. Gobernador</u>, *supra*. En su recurso, el Contralor adujo, esencialmente, que el Gobernador no tenía la facultad constitucional ni legal para reducir el presupuesto de su oficina, ya que operaba por mandato constitucional de forma independiente de la Rama Ejecutiva.[24] Los demandados solicitaron la desestimación de la petición de *mandamus* presentada por el Contralor. Adujeron que la controversia era prematura debido a que el proceso político estaba en busca de soluciones a la crisis gubernamental, siendo ésta, además, una cuestión política que no era susceptible de ser resuelta por los tribunales. Alegaron que el Contralor no tenía capacidad legal ni legitimación activa para instar el referido recurso.[25]

Durante los trámites de este caso, el Contralor identificó la causa u origen de la crisis fiscal determinada por el Tribunal de Primera Instancia, como hecho incontrovertido, en el caso anterior.[26] Determinación similar que realizó este Tribunal en el caso de la Oficina del Contralor que estamos relacionando.[27] Sobre tal asunto,

---

[24] *Íd.*, pág. 361.

[25] *Íd.*, pág. 362.

[26] <u>Presidente de la Cámara v. Gobernador</u>, 167 D.P.R. 149 (2006).

[27] <u>Díaz Saldaña v. Acevedo Vilá</u>, 168 D.P.R. 359 (2006).

expresó el Contralor que el Gobernador, Hon. Acevedo Vilá, estaba facultado y obligado a hacer los ajustes necesarios en la Rama Ejecutiva a los fines de que los desembolsos no sobrepasaran los fondos públicos disponibles para el año fiscal 2005-2006. El Contralor formuló ciertas y determinadas interrogantes sobre tal asunto. ¿Cuándo es que el Gobernador venía obligado a hacer tales ajustes en la Rama Ejecutiva? ¿Cuándo era inminente que se habrían de agotar los fondos públicos en esa rama de gobierno? Afirmó que era de conocimiento público que el Gobernador anunció muy temprano durante el transcurso del año fiscal 2005-2006, que ya divisaba ese escenario en la Rama Ejecutiva. Sostuvo que en ese momento existían dos (2) cursos de acción como alternativas. **Primero**, comenzar un proceso ordenado de recorte de gastos en la Rama Ejecutiva. **Segundo**, confiar en que en algún momento se aprobarían medidas de recaudos adicionales. Afirmó que el Gobernador descansó en la segunda opción. Sostuvo que la prudencia y la Constitución de Puerto Rico requerían que se recurriera desde entonces a la alternativa de un recorte ordenado de gastos en la Rama Ejecutiva. Afirmó que no debió producirse nunca lo que vivimos, un gobierno parcialmente cerrado. Puntualizó que el proceso político, en aquel momento en marcha en la Rama Legislativa, fue el resultado de acciones u omisiones que se arrastraban, por lo menos, desde el comienzo del año fiscal 2005-2006. Sostuvo que el exceso en los gastos de la Rama Ejecutiva sobre los presupuestados y sobre los estimados de ingresos de esa

rama de gobierno durante el año fiscal 2005-2006, fue sometido al foro político porque no se atendió adecuadamente como correspondía. El Contralor era del criterio que el origen de tal exceso era la falta de control de los gastos de la Rama Ejecutiva, en previsión de una negativa legislativa a aprobar legislación para allegar recaudos adicionales.

El 8 de mayo de 2006, el entonces Gobernador y los Presidentes de los cuerpos legislativos designaron una Comisión Especial como parte de la búsqueda de soluciones a los graves problemas fiscales y presupuestarios de la Rama Ejecutiva. Esta Comisión Especial rindió un informe con sus recomendaciones el 10 de mayo de 2006. Como consecuencia, los cuerpos legislativos aprobaron diversas medidas legislativas durante ese mes y año para atender la situación económica de la Rama Ejecutiva, las cuales fueron firmadas por el Gobernador.[28]

En vista de toda la legislación aprobada, de los acontecimientos suscitados entre la Rama Ejecutiva y

---

[28] *Id.*, págs. 362-363. *Véanse además*, Ley para el Financiamiento del Déficit Gubernamental del 2006, Ley Núm. 90 de 13 de mayo de 2006; Ley del Fondo de Interés Apremiante, Ley Núm. 91 de 13 de mayo de 2006; Ley para la Imposición de Contribución Extraordinaria de 2006, Ley Núm. 98 de 16 de mayo de 2006; Ley para la Reforma Fiscal del Gobierno del Estado Libre Asociado de Puerto Rico de 2006, Ley Núm. 103 de 25 de mayo de 2006; Enmiendas a la Ley de Bonos del Gobierno, Ley Núm. 104 de 25 de mayo de 2006; Enmiendas a la Ley de la Oficina de Gerencia y Presupuesto, Ley Núm. 106 de 25 de mayo de 2006; Ley de Control de Gastos en la Nómina Gubernamental para la Reforma Fiscal del Gobierno de Puerto Rico del 2006, Ley Núm. 111 de 31 de mayo de 2006; Resolución Conjunta Núm. 119 de 13 de mayo de 2006 (R.C. de la C. 1485).

Legislativa después del inicio de este caso, de **"los problemas fiscales que atraviesa el Gobierno del Estado Libre Asociado de Puerto Rico"** y por la naturaleza discrecional del recurso de *mandamus*, este Tribunal, una vez más, declinó ejercer su jurisdicción en este asunto y denegó la expedición del auto de *mandamus* solicitado. **Claudicó nuevamente su ministerio de delinear los contornos de nuestra Constitución debido a las referidas actuaciones del Gobernador frente a una crisis fiscal tan seria que estaba creciendo y desarrollándose sin normas claras que delimitaran las limitaciones que tenía el Poder Ejecutivo ante tal situación.**

No obstante, el Tribunal, en ese caso, **tomó conocimiento judicial** de que al ser aprobada la Ley para el Financiamiento del Déficit Gubernamental del 2006, *supra*, y la Resolución Conjunta Núm. 119, *supra*, entre otras piezas legislativas, **"cesaron aquellas razones aducidas por el Gobernador en su Orden Ejecutiva para ordenar el desembolso limitado de los gastos de la Oficina del Contralor"**.[29] Además, **tomó conocimiento judicial** de que a partir de la aprobación de estas medidas, el Gobierno de Puerto Rico **"recibió los fondos necesarios para continuar sus operaciones en la última etapa del año fiscal 2005-2006"**.[30] Por tal motivo, el Tribunal concluyó que la revisión de la Orden Ejecutiva solicitada por el Contralor perdió su

---

[29] *Íd.*, pág. 368.

[30] *Íd.*

eficacia por sus propios términos porque dicho funcionario había obtenido el remedio que nos solicitó.[31] **Una vez más este Tribunal no consideró que la conducta del Gobernador se había repetido según lo había anticipado la Juez Asociada, señora Rodríguez Rodríguez en el caso anterior.[32] Declinó ejercer su jurisdicción para interpretar los contornos de nuestra Constitución y delimitar la frontera y limitaciones del Poder Ejecutivo para lidiar con su evidente crisis presupuestaria. El Tribunal le impartió, repetimos, total, completa, absoluta y ciega deferencia al proceso realizado por las ramas políticas de gobierno sin exigir un ápice de prueba.**

Este Tribunal declinó ejercer su jurisdicción en ese asunto a pesar de que el Gobernador, Hon. Acevedo Vilá, había recurrido en su conducta al violar nuevamente el principio de separación de poderes. Lo anterior, sin garantía alguna de que no se habría de repetir tal conducta y en ausencia de presentación de prueba por el Gobernador sobre la suficiencia de fondos de la Rama Ejecutiva, como consecuencia de las medidas legislativas tomadas para resolver en el futuro la crisis fiscal de la Rama Ejecutiva. Este Tribunal se conformó y aceptó, en aquel momento, que se había resuelto la insuficiencia de fondos de la Rama Ejecutiva para los meses de mayo y junio de 2006, sin indagar ni exigir garantías de que las

---

[31] *Íd.*

[32] *Véase*, <u>Presidente de la Cámara v. Gobernador</u>, 167 D.P.R. 149, 164-200 (2006).

actuaciones del Gobernador no se repetirían durante la aprobación de presupuestos futuros durante ese cuatrienio ante el escenario político de un gobierno compartido. **En aquel momento fueron suficientes sólo las alegaciones del Gobernador y las exposiciones de motivos, contenido y propósito de las referidas piezas legislativas.** No obstante, no se nos ocurriría el imputar a la mayoría de entonces que actuaban **"cual sello de goma"**[33] del entonces Gobernador, mucho menos que esa mayoría no hubiera cumplido **"con [nuestra] función judicial constitucional de adjudicar controversias en forma mesurada y con justificación jurídica".**[34] Ese no es nuestro estilo por el profundo respeto que nos inspira nuestra institución y el principio de colegiación bajo el cual operamos, por virtud de lo cual, entendemos muy respetuosamente que el Pueblo espera mucho más de nosotros.

El Juez Asociado, señor Fuster Berlingeri emitió una Opinión de Conformidad. La Juez Asociada, señora Rodriguez Rodríguez concurrió sin Opinión escrita. Emitimos Opinión Disidente.

Expresamos en nuestra Opinión Disidente, como cuestión de umbral, que la mayoría procedió a denegar el recurso, nuevamente, por académico. Aunque no utilizaron, expresamente, como fundamento tal doctrina, su razonamiento quedó allí enmarcado. La mayoría de entonces sostuvo que

---

[33] *Véase*, nota 18.

[34] Op. Disidente de la Jueza Asociada, señora Fiol Matta, pág. 2.

no debía expedirse el auto solicitado para resolver una controversia que ya había sido resuelta por la Rama Ejecutiva y la Legislativa. Ciertamente, el proceso político entre la Rama Legislativa y la Ejecutiva, dirigido a crear fuentes de recaudo adicionales para el año fiscal 2005-2006 había concluido. No obstante, tal controversia era distinguible de la presente. La primera quedó enmarcada como una cuestión política, la nuestra contenía un asunto justiciable de alto interés público. La mayoría puntualizó, en esa ocasión, que dicho tipo de recurso sólo había de expedirse **"en circunstancias extraordinarias"** cuando el balance de los intereses envueltos amerita la intervención del foro judicial. Sostuvo la mayoría de entonces que aquel caso no contenía tales circunstancias.[35] Discrepamos de tal criterio y curso de acción.

Expresamos, en aquel momento, que el asunto relacionado con la intervención impropia e indebida del entonces Gobernador de Puerto Rico con los fondos públicos asignados por estatuto a la Oficina del Contralor, estaba presente, tenía vigencia y estaba vivo. **Conducta de tal naturaleza fue observada por el entonces Gobernador en forma recurrente y repetitiva, incurriendo en acciones muy serias y graves, violatorias al esquema democrático constitucional vigente. El Gobernador de Puerto Rico no tiene el poder ni la facultad para, mediante Orden Ejecutiva, enmendar una ley vigente que está**

---

[35] <u>Díaz Saldaña v. Acevedo Vilá</u>, 168 D.P.R. 359, 376-377 (2006).

**constitucionalmente obligado a cumplir y hacer cumplir. Está impedido de incurrir en tal actuación para intervenir con los fondos asignados por disposición legislativa a la Oficina del Contralor para sufragar sus gastos de operación.**[36] El cuadro presente en aquel caso contenía las **"circunstancias extraordinarias"** que requiere nuestro ordenamiento jurídico para que la intervención de este Tribunal fuera imprescindible. La **"prudencia y la experiencia"** es el fundamento principal para hacer mandatoria la intervención de este Tribunal para proteger y garantizarle a nuestro pueblo **"los mejores intereses de la justicia y la democracia"**.

Al no intervenir este Tribunal en aquel asunto, claudicó a su ministerio de proteger y garantizarle al Pueblo su democracia frente a la crisis constitucional más grave y seria de su historia.[37]

Sobre el tema del recurso de *mandamus* indicamos lo siguiente:

> Por tratarse de un auto **"altamente privilegiado"**, los tribunales tienen necesariamente que medir **la totalidad de las circunstancias presentes, tanto al determinar si debe o no expedirse el auto, como también al fijar el contenido de su disposición, de haberlo expedido. El remedio se concede sólo cuando el tribunal está convencido de que con ello se cumplirán propósitos de utilidad social e individual. Es indispensable estimar los efectos que tendrá la intervención judicial en el adecuado cumplimiento de las responsabilidades y los deberes del funcionario afectado, al amparo de la Constitución de Puerto Rico y de la ley. Resulta imperativo buscar el**

---

[36] *Íd.*, pág. 377.

[37] *Íd.*

**más fino "balance y equilibrio" entre los diversos intereses en conflicto.**

Este Tribunal tiene la obligación de tomar en cuenta, al momento de considerar un recurso como el presente, el velar y proteger los intereses públicos que puedan ser perjudicados con la expedición del auto solicitado. Tiene el deber ineludible de proteger y garantizar nuestra forma republicana de gobierno, evitando una intromisión indebida de la Rama Judicial con los procesos de las ramas políticas de gobierno. El criterio que gobierna el asunto ante nos consiste en el impacto que la expedición del auto solicitado y nuestra intervención pudiera tener sobre el interés público inmanente del esquema democrático de la Constitución de Puerto Rico. **Este recurso sí presenta las "circunstancias extraordinarias" que requiere nuestro ordenamiento jurídico para que la intervención de este Tribunal sea imprescindible.** La experiencia vivida en dos ocasiones, relativa a alegadas actuaciones iguales o similares del Gobernador nos obliga, como medida prudencial, a intervenir para proteger y garantizar **"los mejores intereses de la justicia y la democracia".** Nuestra intervención en este asunto resulta imprescindible por razón de utilidad social e individual, por la importancia y relevancia que tiene para nuestro sistema constitucional de gobierno democrático. Nuestra intervención resulta mandatoria ante el reiterado incumplimiento del Gobernador a sus deberes y obligaciones ministeriales, al amparo de la Constitución de Puerto Rico y de la ley.[38]

Señalamos, sobre la doctrina de academicidad, lo

siguiente:

**Este caso contiene una situación verdaderamente preocupante respecto a la aplicación de los principios que comprenden la doctrina de la academicidad frente a violaciones graves y muy serias a la Constitución de Puerto Rico y a la ley, en forma recurrente, de parte del Gobernador.**

Tomamos conocimiento judicial que el Gobernador informó desde el principio del cuatrienio sobre

---

[38] *Íd.*, págs. 385-386 (*citando a* <u>Dávila v. Superintendente General de Elecciones</u>, 82 D.P.R. 264 (1960)). (Énfasis nuestro).

la existencia de un déficit presupuestario. También tomamos conocimiento judicial del hecho que desde principio del año fiscal 2005-2006 el Gobernador anunció que los gastos presupuestados habrían de exceder los estimados de ingresos que han de recaudarse.

El Gobernador optó, al principio del año natural 2006, por reducir unilateralmente mediante Orden Ejecutiva los fondos asignados por estatuto a la Rama Legislativa. Tal acción produjo la presentación de dos pleitos por los Presidentes de los cuerpos legislativos ante el Tribunal de Primera Instancia. Dichos asuntos fueron traídos ante nos mediante unos recursos de certificación. **El Gobernador solicitó que se archivaran por académicos esos asuntos, porque había depuesto su actitud de reducirle a la Rama Legislativa su presupuesto, por haber sido identificadas unas fuentes de ingresos que excedían los estimados de ingresos formulados previamente y que hacían innecesaria su intervención con el presupuesto de esa rama de gobierno.** Hace escasamente unos meses este Tribunal tuvo la oportunidad de dirimir esa controversia y de pautar norma al respecto y una Mayoría decidió no hacerlo por estimar que el asunto se convirtió en académico. Disentimos de tal curso de acción sin opinión escrita, en aquel momento, porque entendíamos que el Gobernador, con su proceder, estaba tratando de evadir la revisión de su actuación por este Tribunal. Nos referimos al caso <u>Presidente de la Cámara v. Gobernador</u>, *supra*. La Mayoría entendió que aquella controversia era académica porque no existía una probabilidad razonable de que volviera a repetirse y porque era muy especulativo concluir que una situación de crisis fiscal pudiera suscitarse en el futuro o que el Gobernador volviera nuevamente a reducir unilateralmente los fondos disponibles de otra rama de gobierno para sufragar sus gastos, presupuestados por disposición legislativa. No fue así.

Posteriormente el Gobernador redujo no sólo los fondos asignados al Contralor, sino los de la Rama Judicial y, nuevamente, los de la Rama Legislativa. Nos preguntamos, ¿cuándo era inminente que se le agotarían los fondos públicos disponibles para la Rama Ejecutiva? Lo cierto es que la insuficiencia de fondos de esa rama de gobierno apunta a mayo y junio de 2006, el final del año fiscal 2005-2006. ¿Desde cuándo se conocía tal eventualidad? ¿Qué medidas y ajustes

realizó el Gobernador para reducir o eliminar tal escenario?

No tenemos duda alguna de que la actuación del Gobernador, de hace escasamente unos meses, de deponer su actitud de intervenir los fondos de la Rama Legislativa, tuvo el propósito directo de tornar en académica aquella controversia que estaba ante nos. Por eso disentimos.

Este Tribunal no debió dejar en manos del Gobernador la potestad de decidir cuándo este foro habría de revisar un planteamiento tan serio sobre actuaciones de su parte de violación a principios y derechos constitucionales y estatutarios. Tenemos ante nos un caso que fue traído con la premura y la urgencia que requiere la situación. El Gobernador ha recurrido en su conducta, por lo que no existe garantía alguna de que en el futuro no habrá de incurrir nuevamente en acciones similares. No ha demostrado la inexistencia de una probabilidad razonable de que vuelva a repetirse. Por el contrario existe, ante el cuadro político de un gobierno compartido, la probabilidad razonable de que una situación igual o similar vuelva a producirse. **Persisten en este caso importantes consecuencias no colaterales sino directas, principalmente relacionadas con el funcionamiento del sistema de gobierno democrático del país [sic], que le garantiza al pueblo la Constitución de Puerto Rico.**

La Mayoría permite con su inacción que el Gobernador vuelva a eludir nuestra revisión judicial e incurrir en el futuro en conducta igual o similar. Concluimos que este caso no es académico ni inmeritorio y el país [sic] está pendiente del cabal cumplimiento de nuestro ministerio. **Hoy este Tribunal claudica su función de preservar, proteger y garantizar al Pueblo de Puerto Rico el funcionamiento efectivo y eficiente de su sistema de gobierno democrático.**[39]

Añadimos, entonces, lo siguiente:

**El Gobernador no ha colocado a este Tribunal en posición de determinar que, de concederse el remedio solicitado, intervendríamos en forma impermisible con su rol constitucional. Lo que**

---

[39] Díaz Saldaña v. Acevedo Vilá, 168 D.P.R. 359, 389-391 (2006).

> **está planteado en la controversia ante nos es si el Gobernador excedió las facultades que le otorga la Constitución de Puerto Rico, en un escenario como el presentado. ¿Tenía el Gobernador autoridad concedida por la Constitución de Puerto Rico o por la Legislatura para promulgar la OE-2006-10? ¿Tenía el Gobernador, como deber ministerial impuesto por la Constitución de Puerto Rico, la obligación de cumplir y hacer cumplir la ley, que reconoce y establece la autonomía administrativa, funcional y fiscal de la Oficina del Contralor? ¿Violó el Gobernador el principio de forma republicana de gobierno de la Constitución de Puerto Rico al promulgar la OE-2006-10? Definitivamente todos estos asuntos están sujetos a revisión judicial.[40]**

Ninguna de esas interrogantes que señalamos fue contestada por este Tribunal en aquel momento. ¿Cómo afectó tal inacción y consecuente claudicación del ministerio de este Tribunal, en ambos casos, el desarrollo y crecimiento de la grave crisis fiscal y económica que atravesó en el pasado y atraviesa actualmente la Rama Ejecutiva? ¿Cómo afectaron las medidas y las actuaciones incurridas y adoptadas por los poderes políticos para lidiar con la situación económica del País frente a la ausencia de una delimitación de sus poderes y limitaciones por este Tribunal, a tenor con la Constitución de Puerto Rico? Para analizar y tratar de buscar una contestación a esas interrogantes no habremos de pasar juicio sobre lo actuado por los poderes políticos en el pasado y en el presente en su función de formular la política pública para lidiar con tal problema, sólo en aquella medida en que no contravengan con la Constitución de Puerto Rico y la de Estados Unidos, en alguna de sus partes. Tal asunto le

---

[40] *Íd.*, pág. 401.

corresponde resolverlo al Pueblo de Puerto Rico en las elecciones generales y no a este Tribunal. Sí habremos de evaluar y analizar la conducta de los poderes políticos que pudiera infringir los derechos y disposiciones contenidos en los referidos magnos documentos que cobijan y protegen a los puertorriqueños, y la inacción o actuación de este Tribunal en las diferentes controversias que llegaron ante sí que están directa o indirectamente relacionadas con la presente controversia y que pudieran afectar de una forma u otra su resolución.

**La mayoría declinó, nuevamente, su jurisdicción sobre el mismo asunto, la necesidad de la delimitación de los contornos de la Constitución de Puerto Rico en cuanto a los poderes del Gobernador para conjurar los graves problemas de la Rama Ejecutiva.** Esto, a pesar que las actuaciones del entonces Gobernador afectaban, directamente, el funcionamiento y operación de la Oficina del Contralor, que dentro de nuestro esquema constitucional democrático es el organismo autónomo que fiscaliza el uso de los fondos públicos de las tres (3) ramas de gobierno para ofrecerle al Pueblo de Puerto Rico su función y los servicios públicos que resultan indispensables y necesarios en áreas sensitivas de la vida de cientos de miles de puertorriqueños y la formulación de su política pública.

## III

El 15 de noviembre de 2005, la Cámara de Representantes de Puerto Rico presentó el proyecto de la Cámara 2193, con el objetivo de establecer la Ley de la

Justicia Contributiva de 2006. Dicho proyecto pretendía, según su texto inicial, establecer un impuesto sobre ventas, uso y almacenamiento. Fue aprobado por la Cámara de Representantes, referido al Senado y, posteriormente, aprobado por este último.[41]

Concluida la votación en ambos cuerpos, surgieron diferencias respecto a la tasa contributiva que, en efecto, se impuso mediante la referida pieza legislativa. El Gobernador, Hon. Acevedo Vilá y el Presidente del Senado, Hon. Kenneth McClintock entendieron que el referido proyecto de ley imponía una tasa contributiva de un siete (7) por ciento. Una mayoría de los miembros de la Cámara Baja expresaron que se impuso una tasa contributiva única y total de cinco y medio (5.5) por ciento, distribuido en un cuatro (4) por ciento correspondiente al impuesto estatal y en uno y medio (1.5) por ciento correspondiente al impuesto municipal. Hicieron referencia a una serie de circunstancias y eventos que estaban dentro del récord legislativo y otras que no estaban consignadas en el mismo pero sí habían sido parte del proceso legislativo.[42]

El 4 de julio de 2006, el Gobernador, Hon. Acevedo Vilá, firmó el referido proyecto de ley. Desde entonces la Rama Ejecutiva comenzó a tomar todas las medidas necesarias para la imposición del impuesto estatal sobre la venta y el uso a una tasa contributiva de cinco y medio (5.5) por

---

[41] Romero Barceló v. E.L.A., 169 D.P.R. 460, 463-467 (2006).

[42] Íd., pág. 467.

ciento, a la cual a partir del 15 de noviembre de 2006 se le sumaría una tasa contributiva de uno y medio (1.5) por ciento correspondiente al impuesto municipal.[43]

Ante la inminente imposición de un impuesto a la venta con una tasa contributiva de siete (7) por ciento, el licenciado Carlos Romero Barceló y el señor Peter Muller Maldonado, en calidad de contribuyentes afectados, y otras personas, en calidad de contribuyentes y pensionados afectados, presentaron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda de sentencia declaratoria en contra del Estado, el Gobernador, Hon. Acevedo Vilá y el Secretario de Hacienda, Hon. Juan Carlos Méndez Torres. Impugnaron la interpretación de la Rama Ejecutiva a dicha pieza legislativa a los efectos de imponer una tasa contributiva de cinco y medio (5.5) por ciento para el Estado y uno y medio (1.5) por ciento para los municipios, para un impuesto total máximo sobre ventas y uso de un siete (7) por ciento.[44]

Una vez presentada la demanda de autos, expedidos y diligenciados los emplazamientos correspondientes, el 31 de octubre de 2006, los demandantes acudieron ante nos mediante recurso de certificación. Adujeron que la intervención de este Foro era necesaria dado el interés público que revestía la referida controversia.[45]

---

[43] *Íd.*, págs. 467-468.

[44] *Íd.*, pág. 468.

[45] *Íd.*, pág. 469.

Concedimos a las partes, acortando los términos reglamentarios, hasta el 7 de noviembre de 2006, para que se expresaran. Posteriormente concedimos el mismo término a ambos cuerpos legislativos para que hicieran lo propio. Concluimos en aquella ocasión que **"[e]n vista de que la controversia planteada en el presente recurso –sobre cuál es la tasa contributiva que en realidad impone la Ley Núm. 117 de 4 de julio de 2006– es de alto interés público, que debe ser resuelta en forma definitiva y sin dilación alguna, ya que su fecha de vigencia es inminente, que dicha controversia no sólo afecta, de manera directa, el presupuesto del consumidor puertorriqueño sino que puede afectar el crédito del Estado Libre Asociado de Puerto Rico y, por ende, el futuro y el bienestar de todos los puertorriqueños, avalamos la solicitud de certificación que ante este Tribunal presentaron los demandantes y peticionarios".**[46]

El 6 de noviembre de 2006, compareció ante este Tribunal, en calidad de *amicus curiae*, el Banco Gubernamental de Fomento, en adelante BGF.[47] Entre otras cosas, dicho ente reconoció la existencia de una crisis fiscal al expresar lo siguiente: **"el BGF acude a este Tribunal como parte de su gestión de atender y resolver la crisis fiscal del Gobierno de Puerto Rico".**[48]

---

[46] *Íd.*, pág. 469. (Énfasis nuestro).

[47] Romero Barceló v. E.L.A., 169 D.P.R. 460, 498 (2006).

[48] *Íd.*, pág. 498. (Énfasis nuestro).

En su escrito, el BGF señaló que por treinta (30) años los bonos de Puerto Rico gozaron de una clasificación de "A" por parte de las agencias clasificadoras de crédito "Standard & Poor´s Rating Services", en adelante, S&P, y de "Moody´s Investors Service, Inc.", en adelante, Moddy´s. Sin embargo, el BGF destacó que en mayo de 2005 S&P degradó el crédito de "A" a "BBB" que es la clasificación más baja que tiene cualquier jurisdicción de los Estados Unidos y que está a un paso de caer en la categoría de bonos chatarra. "[A]ún degradado el crédito, S&P se reafirmó en una perspectiva negativa aludiendo a posibles degradaciones futuras si continúa nuestra precaria situación financiera...".[49]

El BGF señaló que el 19 de mayo de 2005, Moody´s también degradó el crédito de "Baa1" a "Baa2" y mantuvo una perspectiva negativa. Así, **el 2 de mayo de 2006, colocó el crédito de Puerto Rico en alerta debido al cierre parcial del Gobierno.**

Posteriormente, el 8 de mayo de 2006, Moody´s volvió a bajar la clasificación de todos los bonos de Puerto Rico, "lo que resultó en una degradación de todos los bonos en circulación de la Corporación para el Financiamiento Público a "Ba1", clasificación de nivel chatarra".[50]

No obstante, según el BGF, **la implantación del IVU del siete (7) por ciento logró que Moody´s reclasificara el**

---

[49] *Íd.*

[50] *Íd.*

**crédito de chatarra a uno de alerta "Baa3"**. Sin embargo, el reconocimiento del BGF sobre la crisis fiscal no dejaba de ser palmario. Muestra de ello fueron sus expresiones siguientes: **"[e]n vista de la seria situación fiscal del Gobierno de Puerto Rico y de nuestra vulnerable situación crediticia ... mantener un IVU de siete (7) por ciento es esencial para [...] evitar degradaciones mayores al nivel de chatarra con las consecuencias nefastas que ello implicaría para Puerto Rico"**.[51]

Por su parte, la parte recurrida, el Gobernador, Hon. Aníbal Acevedo Vilá, **arguyó que del IVU, bajo una tasa de siete (7) por ciento, "depende evitar la prolongación del déficit presupuestario estructural y la degradación del crédito del país"**.[52] En otras palabras, el ex Mandatario reconoció, **nuevamente**, la existencia de una crisis fiscal pero ahora durante el curso del año fiscal 2006-2007.

Concluyó este Tribunal que "del texto de la ley -el cual resulta ser la máxima expresión de la intención legislativa- surge claramente que se estableció una tasa contributiva máxima total de 7%, 5.5% correspondiente al impuesto estatal y un 1.5% correspondiente al impuesto municipal".[53]

En aquella ocasión, el Juez Asociado, señor Fuster Berlingeri emitió una Opinión de conformidad. El

---

[51] *Íd.*

[52] (Énfasis nuestro).

[53] Romero Barceló v. E.L.A., 169 D.P.R. 460, 481 (2006).

suscribiente y la Juez Asociada, señora Rodríguez Rodríguez, emitieron Opiniones Disidentes por separado.

Sobre tal controversia expresamos, en aquella ocasión, que la decisión de la mayoría desvirtuaba la intención legislativa de la Cámara de Representantes que surge de nuestro expediente que, a su vez, es el cuerpo obligado por el Artículo 3, Sección 17 de la Constitución de Puerto Rico, *supra*, a originar medidas de recaudo. La mayoría ignoró el historial legislativo que existe en torno a la Ley Núm. 117, *supra*, toda vez que el Senado aprobó dicha legislación sin debates, enmiendas o informes de Comisión, o sea, tal como quedó aprobada por la Cámara de Representantes. Le imprimió un peso desproporcionado al texto de la ley que hace referencia a un IVU total de siete (7) por ciento cuando del récord legislativo surge que tal porcentaje es un error de redacción. No avalamos tal curso de acción.[54]

El profundo respeto que nos merece la intención del legislador nos obliga, en determinadas ocasiones, a suplir las inadvertencias en que éste pueda haber incurrido. Para evitar un resultado irrazonable e insostenible, en el pasado no hemos vacilado en aclarar el texto de una ley para conformarla a la intención legislativa. Es regla dorada de hermenéutica judicial, que las disposiciones de una ley deben ser examinadas e interpretadas de modo que no

---

[54] *Íd.*, pág. 505.

conduzcan a resultados irrazonables e insostenibles, sino a unos armoniosos.[55]

Sobre tal controversia, en aquella ocasión, en su Opinión Disidente, la Juez Asociada, señora Rodríguez Rodríguez expresó lo siguiente:

> Este caso no es justiciable. Hoy, una mayoría de los miembros de este Tribunal sostiene que los demandantes, como contribuyentes y ciudadanos, tienen legitimación activa para impugnar en los tribunales la interpretación que hace la Rama Ejecutiva de una ley de contribuciones de aplicación general y uniforme aprobada por la Asamblea Legislativa, sin que éstos hayan alegado que haya habido violación constitucional de clase alguna. Disiento porque soy del criterio que la conclusión del Tribunal respecto la legitimación de los demandantes es errónea y no encuentra apoyo en la doctrina sobre el pleito del contribuyente.
>
> Sostengo que ante la naturaleza generalizada de la queja presentada por los demandantes, sumado a la ausencia de un planteamiento de violación de un derecho constitucional por la puesta en vigor de la Ley de Justicia Contributiva de 2006, éstos carecen de legitimación activa como contribuyentes y pensionados, o ciudadanos, para impugnar la interpretación de la ley por parte de la Rama Ejecutiva. Ello a su vez nos lleva a concluir que el curso de acción correcto es la desestimación de la demanda instada.[56]

El 4 de julio de 2006, el Gobernador firmó el referido proyecto de ley sobre ventas al detal. Surge de la referida controversia ante el Tribunal de Primera Instancia que después de esa fecha el Gobernador, Hon. Acevedo Vilá, aún persistía en su argumento de la necesidad de mayores recaudos para enfrentar la crisis fiscal de la Rama

---

[55] *Íd.*

[56] <u>Romero Barceló v. E.L.A.</u>, 169 D.P.R. 460, 506 (2006) (Op. Disidente de la Juez Asociada, señora Rodríguez Rodríguez).

Ejecutiva cuando intentó imponer, y pretendió que este Tribunal le permitiera imponer, una tasa contributiva estatal de un cinco y medio (5.5) por ciento en vez de un cuatro (4) por ciento como pretendió la Cámara de Representantes. La Resolución de este Tribunal se produjo el 10 de noviembre de 2006. **Nótese que ya la crisis fiscal de la Rama Ejecutiva estaba extendida al año fiscal 2006-2007.**

IV

De las referidas tres (3) controversias que atendió este Tribunal surge, **claramente**, la existencia de una recurrente crisis fiscal de la Rama Ejecutiva durante el cuatrienio que comenzó en enero de 2005 y culminó en diciembre de 2008. De los expedientes ante nos, surge la aprobación, durante ese cuatrienio de diversas medidas legislativas a petición de la Rama Ejecutiva para resolver la grave crisis presupuestaria de esa rama de gobierno. Surgen, además, determinaciones, **como hecho incontrovertido**, de los dos (2) jueces del Tribunal de Primera Instancia mencionados previamente, a base de la prueba documental ofrecida a tenor con la entonces vigente Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R.36, de la existencia de una crisis fiscal en la Rama Ejecutiva.

En Díaz Saldaña v. Acevedo Vilá, 168 D.P.R. 359 (2006), resuelto el 30 de junio de 2006, este Tribunal concluyó que atendidas las piezas legislativas aprobadas durante el mes de mayo de 2006, después de iniciado ese caso, **"para conjurar los problemas fiscales que atraviesa**

**el Gobierno del Estado Libre Asociado de Puerto Rico"**
declinó su jurisdicción.[57] No obstante, el Gobernador, Hon.
Acevedo Vilá, con posterioridad al 4 de julio de 2006,
persistió en su argumento ante nos de la necesidad de
fondos adicionales para la Rama Ejecutiva (cinco y medio
(5.5) por ciento de impuesto de consumo estatal en vez del
cuatro (4) por ciento) durante el año fiscal 2006-2007.
Este Tribunal asumió jurisdicción sobre la controversia,
**sin haberse desfilado un ápice de prueba ante el Tribunal
de Primera Instancia, expidió el auto de certificación
solicitado, concedió la petición de más fondos del
Gobernador para la Rama Ejecutiva, reconociendo la grave
crisis fiscal en que se encontraba esa rama de gobierno.
No obstante, no le permitió a la Cámara de Representantes
presentar evidencia sobre sus alegaciones, que no constató
su naturaleza y si podía ser de naturaleza testifical o
documental. Este Tribunal actuó, en ese caso, sin el
expediente completo que aquí exponen los compañeros
disidentes como imprescindible por imperativo del debido
proceso de ley y la norma jurisprudencial vigente sobre el
tema. En ese caso, la mayoría de entonces apoyó el texto
de la ley y su exposición de motivos para acoger la
posición del Gobernador de que se le permitiera imponer un
impuesto estatal sobre las ventas al detal de un cinco y
medio (5.5) por ciento y no el cuatro (4) por ciento como
reclamaba la Cámara de Representantes. No necesitó un**

---

[57] <u>Díaz Saldaña v. Acevedo Vilá</u>, *supra*, pág. 360.

**récord construido por el Tribunal de Primera Instancia con determinaciones de hechos para ello.** Bajo las premisas en contrario, esbozadas al presente por los distinguidos miembros de este Foro que disienten en este caso, como es su legítimo derecho, concluimos que son **INCONSISTENTES** con lo actuado por ellos mismos en Presidente de la Cámara v. Gobernador, *supra*, Díaz Saldaña v. Acevedo Vilá, *supra*; y Romero Barceló v. E.L.A., *supra*. No obstante, somos incapaces, por las razones y motivos antes expuestos, de referirnos a nuestros compañeros como lo hicieron las Juezas Asociadas, señora Fiol Matta y Rodríguez Rodríguez en sus Opiniones Disidentes sobre los miembros de la mayoría en el presente caso, como veremos más adelante.

V

**Opiniones Disidentes**

A.

La distinguida Jueza Asociada, señora Fiol Matta expresa en su Opinión Disidente lo siguiente: "la opinión se equivoca al elaborar las premisas mayores de su razonamiento, es decir, las normas de derecho aplicables, según abundaremos más adelante, pero más peligrosamente, se equivoca en cuanto a la función judicial se refiere pues carece de una premisa menor válida, **por cuanto descansa en los hechos expuestos en la exposición de motivos de la ley que son, en fin, los hechos alegados por el Estado.** La unión de ambos errores de método tan solo pueden llevarnos

al error en la decisión".[58]    Añade que la opinión
mayoritaria "acepta, sin prueba, que existe una crisis
fiscal y un problema de gigantismo gubernamental, así como
que no existe otra opción para corregir el déficit
estructural del gobierno central, que no sea el despido de
empleados públicos y la suspensión de los derechos
laborales.  Esto, a pesar de que existen diversos informes
o documentos que cuestionan esa hipótesis.  En otras
palabras, **la mayoría de este Tribunal no tomó en
consideración posiciones distintas a la adoptada por la
Legislatura, porque no hubo oportunidad para recibir y
dirimir prueba en un foro de primera instancia o
administrativo".[59]**

La Jueza Asociada, señora Fiol Matta puntualiza, sobre
este tema, que **"la mayoría resume y parafrasea las partes
de la exposición de motivos de la Ley Núm. 7 de 2009, que
aluden a la crisis fiscal.  Específicamente, desglosa los
datos sobre el alegado déficit estructural en cuatro
subtemas, a saber: las razones para la crisis,
consecuencias de la crisis, las alternativas ante la crisis
y la solución implantada por la Asamblea Legislativa.
Finalmente, aplica dichos datos, cuya única fuente es la
exposición de motivos, y que resultan ser también las**

---

[58] Op. Disidente de la Jueza Asociada, señora Fiol Matta,
págs. 9-10.  (Énfasis nuestro).

[59] *Íd.*, pág. 10.

**alegaciones del Estado, sin examinar prueba que las sustente o las contradiga".**[60]

Añade nuestra compañera, la distinguida Jueza Asociada, señora Fiol Matta, "no pretendo negar la importancia que tiene este recurso y la bondad para el país de que se resuelva prioritariamente. Sin embargo, precisamente **por ser un caso de alto interés público que incide de manera trascendental en los derechos laborales y constitucionales de los empleados afectados, era necesario evaluarlo con cuidado y analizarlo desde diferentes perspectivas.** El hacerlo no hubiera afectado en nada la situación existente puesto que los empleados recurridos ya fueron despedidos de sus empleos. No obstante, **como la mayoría de este Tribunal decidió certificar y consolidar estos casos para atender el asunto constitucional, a pesar de las consideraciones que hemos expuesto y de la ausencia de prueba en el legajo, nos vemos en la obligación de discutir los aspectos constitucionales de esta controversia".**[61]

La Jueza Asociada, señora Fiol Matta realiza el ejercicio de tratar de distinguir lo actuado por la entonces mayoría en noviembre de 2004 en Suárez v. C.E.E. I, 163 D.P.R. 347 (2004); y Suárez v. C.E.E. II, 163 D.P.R. 374 (2004), del presente caso. Expresa que la controversia plantada en Suárez, *supra*, era **solamente** de derecho y no de

---

[60] *Íd.*, págs. 10-11. (Énfasis nuestro).

[61] *Íd.*, págs. 16-17. (Énfasis nuestro).

hechos. Puntualiza, en tal ejercicio, que el caso de Suárez, *supra*, trata sobre el **derecho fundamental al voto que le otorga nuestra Constitución** a todos los puertorriqueños y por consiguiente era este Tribunal el llamado a entender inicialmente en esta controversia. Señala que en Suárez, *supra*, tuvimos el beneficio de una decisión que el Tribunal de Primera Instancia había tomado en corte abierta.

La Jueza Asociada, señora Fiol Matta expresa que este Tribunal decidió abordar el asunto de la constitucionalidad del Capítulo III de la Ley Núm. 7, *supra*, **consolidando casos disimiles y certificándolos prematuramente para apresurarse a resolver el asunto constitucional.** Sostiene que tal actuación provoca que **no hayamos cumplido con nuestra "función judicial constitucional de adjudicar controversias en forma mesurada y con justificación jurídica".**[62]

**Concluye que la génesis del problema fue la decisión de este Tribunal de certificar esos casos antes de que se recibiera prueba o se desarrollaran las teorías de las partes a nivel de primera instancia.  Sostiene que es necesario que se considere la complejidad de la controversia, su urgencia, la necesidad de recibir y dirimir la prueba y la etapa procesal en la cual se encuentra el caso.**

---

[62] *Íd.*, pág. 2.

Señala la Jueza Asociada, señora Fiol Matta que "[u]n análisis somero de los expedientes de los recursos consolidados nos permite percibir que las controversias que se presentan no tan solo son complejas, sino múltiples y diversas. Entre éstas, en algunos casos se alega discrimen por afiliación política, en otros discrimen por embarazo; también hay alegaciones de discrimen por razón de edad, incumplimiento en la aplicación de la ley respecto a la antigüedad y al principio de mérito, así como alegaciones de exclusión de la aplicación de la ley, fundamentada en el Artículo 37.02, entre otros. Además, se argumenta la inconstitucionalidad de la Ley Núm. 7 de 2009 por la violación del debido proceso de ley en su vertiente procesal y sustantiva, el menoscabo de las obligaciones contractuales y la delegación inconstitucional de poderes por parte de la Asamblea Legislativa al Poder Ejecutivo".[63]

Sostiene que, estos casos estaban asignados a distintos jueces y no consta cuándo se tomó, ni quién tomó, la decisión de consolidarlos y asignarlos todos al Juez ponente, el compañero Juez Asociado, señor Kolthoff Caraballo. La consolidación de tan accidentada, por así decirlo, de estos casos, es el segundo factor que provoca que el método y los fundamentos de derecho de la Opinión mayoritaria resulten inconsistentes e ilógicos.

Afirma que cada uno de estos asuntos pudo requerir la intervención del foro administrativo o del Tribunal de

_____

[63] Op. Disidente de la Jueza Asociada, señora Fiol Matta, págs. 5-6.

Primera Instancia para dirimir prueba y crear un expediente que permitiera la labor efectiva de los foros apelativos, incluyendo este Tribunal. Puntualiza, como axiomático, que el derecho no se aplica en el vacio, sino que requiere de hechos que sirvan de base para aplicar las normas.[64]

Nos sorprenden las expresiones de la Jueza Asociada, señora Fiol Matta sobre el aspecto de la consolidación de los casos de epígrafe. De los expedientes internos que reflejan la operación y funcionamiento de nuestras oficinas constan los memorandos sobre tal asunto. A base de los cuales se produjo la decisión sobre la consolidación emitida por este Tribunal de los casos de epígrafe. **De tal procedimiento, surge con claridad, que la consolidación de estos casos no fue una "accidentada".**

Más aún, constan de los expedientes en la oficina de cada juez los referidos memorandos que se circularon a tales efectos. Sabemos que todos los jueces que componemos este Foro tenemos un gran cúmulo de trabajo, pero ello no puede ser óbice para que no estemos relacionados con las incidencias particulares de cada caso que a la vez producen los pronunciamientos judiciales que emitimos. **Todos los casos consolidados fueron asignados al miembro del Tribunal que se le había asignado el recurso más antiguo, que fue el Juez Asociado, señor Kolthoff Caraballo, como es la norma en esos asuntos en el Tribunal General de Justicia en todos sus niveles.**

---

[64] *Íd.*, pág. 6.

Como es sabido, el mecanismo de consolidación surge de la Regla 38.1 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III, R.38.1, que establece que:

> Cuando estén pendientes ante el tribunal pleitos que envuelvan cuestiones comunes de hechos o de derecho, este podrá ordenar la celebración de una sola vista o juicio de cualquiera o de todas las cuestiones litigiosas envueltas en dichos pleitos; podrá ordenar que todos los pleitos sean consolidados; y podrá, a este respecto, dictar aquellas ordenes que tiendan a evitar gastos innecesarios o dilación.

Este mecanismo procesal de consolidación, responde a la necesidad de darle concreción al principio axiomático subyacente en las Reglas de Procedimiento Civil, que predica la solución justa, rápida y económica de todo procedimiento. *Véase*, Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap.III, R.1. Este postulado hace asequible que los tribunales unan dos (2) o más pleitos ante su consideración para fines de su tramitación o para fines de juicio. Hosp. San Francisco v. Secretario de Salud, 144 D.P.R. 586, 592 (1997). *Véase además*, J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Pub. JTS, 2000, T. 2, pág. 630. La finalidad de este vehículo procesal es "evitar la proliferación de acciones, lograr la economía procesal y evitar la indeseable probabilidad de que surjan fallos incompatibles relacionados con un mismo incidente". Vives Vázquez v. E.L.A., 142 D.P.R. 117, 125 (1996); Granados v. Rodríguez Estrada II, 124 D.P.R. 593, 608 (1989).

De la faz de la Regla 38.1 de Procedimiento Civil, *supra*, surgen dos (2) requisitos o criterios que se deben

ponderar para que proceda la consolidación de los casos en cuestión. Primero, que los casos presenten cuestiones comunes de hechos o de derecho. Segundo, que los casos estén pendientes ante el tribunal. *Véase*, Vives Vázquez v. E.L.A., *supra*, pág. 126. Sobre este último requisito, hemos señalado que en nuestro sistema judicial unificado la frase "cuando estén pendientes ante el tribunal" sólo requiere que los casos a consolidarse se hayan presentado y su trámite este pendiente ante alguna de las salas del Tribunal de Primera Instancia. Hosp. San Francisco v. Secretario de Salud, *supra*, págs. 591-592.

En torno al primer requisito, en Vives Vázquez v. E.L.A., *supra*, pág. 127, este Tribunal sostuvo que la consolidación de acciones o recursos puede permitirse sin que sea necesario que la totalidad de las cuestiones de hechos y de derecho sean idénticas. Por tal, las consideraciones particulares que puedan caracterizar a algunos recursos no son óbice para que la consolidación sea concedida. *Íd. Véase además*, Skirvin v. Mesta, 141 F.2d 668 (10mo Cir. 1944). De igual manera, este Foro señaló que las cuestiones de hechos y de derecho no tienen que ser comunes en los casos a consolidarse, bastando que exista afinidad en una u otras. Finalmente, tampoco se requiere que haya identidad entre las partes en los pleitos a consolidarse para conceder la consolidación. Vives Vázquez v. E.L.A., *supra*; Hosp. San Francisco v. Secretario de Salud, *supra*, pág. 593. *Véase además*, R. Hernández Colón, Práctica Jurídica de Puerto Rico, Derecho Procesal Civil,

4ta ed., San Juan, Pub. LexisNexis, 2007, sec. 3601, pág. 303.

Es importante destacar que la consolidación de pleitos puede ser ordenada a solicitud de una parte o *motu proprio* por el tribunal. Díaz Maldonado v. Lacot, 123 D.P.R. 261, 266, n. 2 (1989); R. Hernández Colón, op. cit., sec. 3601, pág. 303. Además, la consolidación puede proceder a nivel apelativo. *Véase*, Otero Prann v. Delbrey Rivera, 144 D.P.R. 688 (1998).

Por otro lado, no es extraña a este Foro la práctica de consolidar para efectos de su adjudicación distintos recursos en la propia Opinión emitida. *Véanse*, Vives Vázquez v. E.L.A., *supra*, pág. 122, n.4; Díaz Maldonado v. Lacot, *supra*; In re Colón Rivera, 170 D.P.R. 440, 442 (2007); Pérez v. VPH Motor Corp., 152 D.P.R. 475, 482 (2000); Montoto v. Lorie, 145 D.P.R. 30, 38, n.2 (1998); Aponte v. Sears Roebuck de P.R., Inc., 144 D.P.R. 830, 838 (1998); Bacardi Corp. v. Congreso Uniones Inds., 141 D.P.R. 100, 102 (1996); P.P.D. v. Gobernador I, 139 D.P.R. 643, 650-651 (1995); Pilot Life Ins. Co. v. Crespo Martínez, 136 D.P.R. 624, 631 (1994). De hecho, tal proceder es refrendado por la Regla 50 de este Tribunal que dispone lo siguiente: "[e]n situaciones no previstas por este reglamento, el tribunal encauzará el trámite en la forma que su juicio sirva los mejores intereses de todas las partes". Regla 50 del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI-A, R.50. *Véase además*, Pérez v. VPH Motor Corp., *supra*.

A la luz de la preterida normativa, es indubitado que los hechos esbozados en la Opinión mayoritaria demuestran fehacientemente que este Tribunal se enfrentó a varios casos motivados por una misma actuación, el despido de distintos empleados públicos bajo la Ley Núm. 7, *supra*. Si bien es cierto que las partes, los puestos que ocupaban y sus lugares de trabajo eran distintos, no es menos cierto que todos impugnaban la constitucionalidad de la Ley Núm. 7, *supra*. Es decir, la controversia esencial en cada uno de los casos consolidados era la misma. Por tal razón, aunque cada recurso tenía ciertas consideraciones particulares que le caracterizaban, eso no era un impedimento para que concediéramos la consolidación a los efectos de considerar el referido planteamiento, común de todos ellos.

En fin, por estar pendiente ante nuestra consideración y por ser las cuestiones de hechos y de derecho comunes en los recursos, procedía su consolidación. Además, como hemos esbozado, no existe ningún impedimento para que lo hiciéramos al momento de emitir la Opinión, luego de haber recibido el aval de la mayoría de los miembros de este Tribunal, según surge del procedimiento colegiado mencionado previamente.

B.

De otra parte, la distinguida Jueza Asociada, señora Fiol Matta señala que la Opinión mayoritaria es metodológicamente incorrecta porque recurre a la interpretación que han hecho los tribunales apelativos

federales sobre la norma establecida por el Tribunal Supremo Federal en U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1 (1977).[65] Nada más lejos de la verdad.

Como principio básico de metodología jurídica procede recurrir, a modo ilustrativo, a las interpretaciones que han realizado los tribunales apelativos federales sobre las normas establecidas por el Tribunal Supremo de Estados Unidos de forma que se le pueda dar contenido a lo dicho por ese máximo foro. **De hecho, esta "metodología" ha sido utilizada por la Jueza Asociada, señora Fiol Matta que al presente le adscribe el carácter de impropiedad o ilegitimidad.** *Véase*, Pueblo v. Carmelo Velázquez Colón, 2008 T.S.P.R. 124; 174 D.P.R. ___ (2008), res. 18 de julio de 2008.

Como bien explicamos en la Opinión mayoritaria, el Tribunal Supremo de Estados Unidos ha expresado que en casos de contratación pública no es correcto dar deferencia absoluta al análisis de razonabilidad y necesidad que hizo el Estado. No obstante, el propio Tribunal Supremo Federal reconoce y postula como necesario conceder, alguna deferencia a la actuación estatal. Así lo ha concedido el más alto foro federal.

Según citamos en la Opinión mayoritaria y ahora nos vemos precisados a repetir, así lo han interpretado los tribunales federales apelativos al darle contenido a lo dicho por el Tribunal Supremo Federal. En Local Division

---

[65] Op. Disidente de la Jueza Asociada, señora Fiol Matta, pág. 35.

589, Amalgamated Transit Union, AFL-CIO, CLC v. Commonwealth of Massachusetts, 666 F.2d 618, 643 (1981) (*certiorari denegado en* Local Division 589, Amalgamated Transit Union, AFL-CIO, CLC v. Commonwealth of Massachusetts, 457 U.S. 1117 (1982)), el Tribunal Federal de Apelaciones para el Primer Circuito señaló lo siguiente:

> [D]etermining the "reasonableness and necessity of a particular statute **is a task far better suited to legislators than to judges.** Thus, in the case before us, where economic or social legislation is at issue, **some deference to the legislature´s judgment is surely called for.** (Énfasis nuestro).

De igual modo se manifestó el Tribunal Federal de Apelaciones para el Segundo Circuito, en Buffalo Teachers Fed. v. Tobe, 464 F.3d 362, 370 (2006) (*certiorari denegado en* Buffalo Teachers Fed. v. Tobe, 550 U.S. 918 (2007)), al enunciar lo siguiente:

> **We hasten to point out that less deference does not imply no deference**... Relatedly, we agree with the First Circuit that *U.S. Trust Co.* does not require courts to reexamine all of the factors underlying the legislation at issue to make a *de novo* determination whether another alternative would have constituted a better statutory solution to a given problem. (Énfasis nuestro).

Añade la Jueza Asociada, señora Fiol Matta que "para determinar los hechos relevantes la Opinión mayoritaria se sustenta exclusivamente en **la exposición de motivos y acepta, sin prueba, que existe una crisis fiscal y un problema de gigantismo gubernamental, así como que no existe otra opción para corregir el déficit estructural del**

**gobierno central, que no sea el despido de empleados públicos y la suspensión de los derechos laborales".**[66]

Por el contrario, la Legislatura sí contempló y dispuso sobre otras medidas para resolver la crisis fiscal de la Rama Ejecutiva en la Ley Núm. 7, *supra*. Incluyó, en un plan integral para ello, medidas de ingresos y mejor fiscalización, medidas de reducción de gastos y otras financieras, entre muchas otras. Sobre esos extremos, el proceso que fue descargado por los poderes políticos en la formulación de política pública sobre **"la declaración de un estado de emergencia fiscal y el establecer el plan integral de estabilización fiscal para salvar el crédito de Puerto Rico"** es una cuestión política con la cual no habremos de intervenir pues no es nuestra función transformarnos en un **SUPER GOBIERNO** sobreponiéndonos sobre las otras dos (2) ramas políticas del Estado y gobernar sobre áreas propias de esos poderes políticos, a través del procedimiento de sentencia declaratoria e injunction. **Nuestra función es auscultar, como así lo hicimos extensamente, si está presente en dicho proceso político alguna violación a los derechos protegidos de los demandantes de autos otorgándole el grado de deferencia al proceso legislativo que el ordenamiento jurídico exige.** Sobre este asunto existe un abismo entre el criterio de la mayoría y de los disidentes en el presente caso, que como hemos podido observar es **INCONSISTENTE** con la postura de

---

[66] *Íd.*, pág. 10. (Énfasis nuestro).

estos últimos en el pasado en los casos mencionados previamente y que están relacionados con la presente controversia.   Los jueces disidentes no le otorgan deferencia alguna al proceso de las dos (2) ramas políticas del gobierno, por ausencia de prueba, en el caso ante nos. No obstante, en forma **INCONSISTENTE** con lo actuado por ellos en los casos previamente relacionados le impartieron una deferencia desproporcionada al referido proceso político de gobierno, sin exigir un ápice de prueba, como es su criterio al presente.

La Jueza Asociada, señora Fiol Matta expresa, citando a Warner Lamber v. Tribunal Superior, 106 D.P.R. 378, 398 (1973), que las declaraciones legislativas sobre los males sociales que el legislador intenta remediar merecen el respeto de este Tribunal.   No obstante, sentencia que tales declaraciones deben estar fundadas en hechos de conocimiento general y no constituir un mero fíat legislativo.[67]   La presente crisis fiscal de la Rama Ejecutiva es de amplio conocimiento público y judicial, como hemos podido apreciar.   No compartimos la óptica de la distinguida Jueza disidente en su ejercicio de aplicación de dicha normativa jurisprudencial al presente caso.   No consideramos lo actuado durante el proceso legislativo, por esa Rama de Gobierno en esta ocasión, frente a la grave crisis fiscal que atraviesa la Rama Ejecutiva, como un mero fíat legislativo.

---

[67] *Íd.*, págs. 35-36.

Además, la Jueza Asociada, señora Fiol Matta sostiene que por no haberse construido un récord en el Tribunal de Primera Instancia y no contando con determinaciones de hechos de ese foro primario la mayoría estaba impedida de decretar la inconstitucionalidad de la Ley Núm. 7, *supra*. **No obstante, la distinguida Juez disidente concluye que dicho estatuto es inconstitucional, aunque no se presentara prueba para rebatir la presunción de validez constitucional que le cobija a toda ley aprobada.** Si ella entiende que es necesaria la presentación de prueba ante el Tribunal de Primera Instancia para evaluar la constitucionalidad de la ley, ¿cómo puede proceder en contrario, sin contar con esa prueba, para concluir que es inconstitucional? No entendemos tal razonamiento. No hay la necesidad en el presente asunto de desfilar prueba alguna ante el Tribunal de Primera Instancia para evaluar la constitucionalidad de la Ley Núm. 7, *supra*, y así procedimos. Puntualizamos que la Jueza Asociada, señora Fiol Matta procedió a evaluar la validez del referido asunto de igual forma.

La Jueza Asociada, señora Fiol Matta luego de pronunciar que la mayoría se **"apresuró"** a adjudicar la controversia ante nos **"sin mesura y justificación jurídica"**, debido a la ausencia de prueba en los autos, refiriéndose a la decisión de declarar válido el referido estatuto, concluyó que el Capítulo III de la Ley es inconstitucional no tan sólo de su faz sino en su aplicación. Según la distinguida Jueza Asociada, señora Fiol Matta hay **"mesura y justificación jurídica"**, con el

récord ausente de prueba presentada ante el Tribunal de Primera Instancia, para concluir sobre la inconstitucionalidad del referido estatuto pero no tiene esa misma **"mesura y justificación jurídica"** la mayoría para concluir lo contrario, con el mismo escenario.

La compañera Jueza Asociada, señora Fiol Matta se lamenta de que **"[l]a Constitución es algo más que un depósito de palabras..."**[68] **describiendo el proceso de razonamiento jurídico y decisional de la mayoría y señala que "después de esta decisión, el derecho constitucional en las escuelas de derecho se enseñará 'antes' y 'después' de la Ley Núm. 7 de 2009...".**[69] La Jueza Asociada, señora Rodríguez Rodríguez se expresa en forma similar al señalar que, la Opinión del Tribunal se revela como **"galimatías constitucionales", expuestas así, sin un análisis jurídico riguroso que acompañe la extensa e innecesaria disertación,** entre varios adjetivos que nos dirigiera. El diccionario de la Real Academia de la Lengua Española, Vigésima Primera Edición, define la palabra **"galimatías"** como **"escrito embrollado"** que contiene **"lenguaje oscuro por la impropiedad de la frase o por la confusión de las ideas".** Con mucho respeto, tenemos que rechazar vehementemente esas aseveraciones. En todo caso, si hay un cambio en el derecho constitucional que merece estudio es el que ocurrió en los casos que la compañera Jueza Asociada, señora Fiol

---

[68] *Íd.*, pág. 64.

[69] *Íd.*, pág. 65.  (Énfasis nuestro).

Matta cita en su Opinión Disidente: Suárez v. C.E.E. I, *supra*; y Suárez v. C.E.E. II, *supra*.

En aquel entonces, el Juez Presidente y las señoras Juezas Asociadas que hoy disienten, como parte de la mayoría, ignoraron las directrices recogidas en el caso seminal de E.L.A. v. Aguayo, 80 D.P.R. 552 (1958), y su progenie. Este Tribunal asumió jurisdicción y emitió una Opinión en un caso acogido mediante el recurso de certificación, aunque: la parte peticionaria **no había sido adversamente afectada por la decisión revisada, pues había prevalecido en la agencia administrativa (la Comisión Estatal de Elecciones) y la validez de ese dictamen no se había cuestionado**; y no había jurisdicción por la presencia de un "Notice of Removal" del caso al foro federal.

Ahora, cuando se resuelve una cuestión de derecho mediante el mecanismo procesal de la certificación, dentro de un **"caso y controversia justiciable"**, y se recurre a normas de derecho ya establecidas en la jurisprudencia, la Jueza Asociada, señora Fiol Matta dice que hay un derecho constitucional distinto. Las preguntas obligadas son, ¿qué pasó en Suárez v. C.E.E. I, *supra*; y Suárez v. C.E.E. II, *supra*? ¿Cuándo fue que en realidad se deshicieron **"los fundamentos metodológicos de la mejor hermenéutica constitucional..."**? ¿Es ahora que atendemos un asunto de derecho en el ejercicio de nuestra función como máximos intérpretes de la Constitución o fue entonces, en Suárez v. C.E.E. I, *supra*; y Suárez v. C.E.E. II, *supra*, cuando este

Tribunal emitió una opinión consultiva en ausencia de un "caso y controversia justiciable"?

"Después" de Suárez v. C.E.E. I, *supra*; y Suárez v. C.E.E. II, *supra*, surgió un derecho constitucional diferente al de "antes"; al de E.L.A. v. Aguayo, *supra*, o cuando menos por "excepción", en aquel momento y para aquel caso, sobre el aspecto de justiciabilidad. Por la situación del momento, los límites constitucionales de **"caso y controversia"** pasaron a ser un mero **"depósito de palabras"**.

C.

Por su parte, el distinguido Juez Presidente, señor Hernández Denton disintió del curso de acción de la mayoría porque **afirma que el trámite judicial en este caso fue apresurado y resulta contrario al debido proceso de ley al eliminar los derechos adquiridos sobre los empleos de miles de servidores públicos en violación de la prohibición constitucional contra el menoscabo de obligaciones contractuales establecida tanto en la Constitución de Puerto Rico como en la Constitución de Estados Unidos. Sostiene que la Opinión del Tribunal que declara válida la Ley Núm. 7, *supra*, se basa en un expediente judicial desprovisto de la prueba necesaria para resolver de forma adecuada y fundamentada la controversia.**[70]

Señala el Juez Presidente, señor Hernández Denton que la Opinión del Tribunal ni siquiera cumple con el ámbito mínimo de protección establecido en la Constitución de

---

[70] Op. Disidente del Juez Presidente, señor Hernández Denton, pág. 1-2.

Estados Unidos. Afirma que la Opinión nos ha colocado al margen de la normativa que formuló el Tribunal Supremo de Estados Unidos sobre la referida prohibición constitucional. **Se refiere, el distinguido compañero a la necesidad de un expediente judicial que contenga prueba que permita evaluar adecuadamente los criterios establecidos en U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1 (1971), y que adoptó este Tribunal en Bayrón Toro v. Serra, 119 D.P.R. 605 (1987).** Puntualiza, como más imperiosa la aplicación de tal normativa a este caso al considerar la magnitud del impacto de la Ley Núm. 7, *supra*, sobre los empleados públicos afectados y el efecto que la decisión del Tribunal tendrá en el País.[71] No obstante, no consideró como importante, ni siquiera en menor grado, la aplicación de estas doctrinas jurisprudenciales de acuerdo a su presente criterio, a los casos de Presidente de la Cámara v. Gobernador, *supra*; Díaz Saldaña v. Acevedo Vilá, *supra*; Romero Barceló v. E.L.A., *supra*; Suárez v. C.E.E. I, *supra*; y Suárez v. C.E.E. II, *supra*.

Igual que la Jueza Asociada, señora Fiol Matta, el Juez Presidente, señor Hernández Denton concluye que **"la decisión que el Tribunal emite en el caso de autos se toma únicamente basada en el propio texto de la Ley Núm. 7, *supra*, y su Exposición de Motivos, sin que se haya presentado en los tribunales la prueba necesaria para establecer que el plan de cesantías decretado era la**

---

[71] *Íd.*, pág. 2.

**alternativa menos onerosa a la luz de la situación fiscal, según lo requerido por la doctrina establecida por el Tribunal Supremo de Estados Unidos, y sin permitir a los empleados cesanteados refutarla.** Con la Opinión emitida en este caso por el Tribunal, nos colocamos al margen de la Constitución Federal y correspondería entonces al Tribunal Supremo de Estados Unidos rectificar esta decisión".[72]

El Juez Presidente, señor Hernández Denton considera como contrario a las normas de derecho aplicables en Puerto Rico el que este Tribunal no vacilara en expedir los recursos de certificación de epígrafe a pesar de la naturaleza discrecional y excepcional que caracteriza este tipo de recurso. **Concluye que el Tribunal circunvaló el trámite ordinario en los casos de epígrafe por no contar con un expediente para dilucidar las alegaciones de las partes. Expresa que cada uno de los recursos de epígrafe llegó a la consideración de este foro pocos días luego de presentarse las demandas correspondientes ante el Tribunal de Primera Instancia y diligenciarse los emplazamientos. En esencia afirma, que los autos de los casos ante nuestra consideración solamente consisten de la petición de certificación, la demanda y los alegatos de las partes. Puntualiza que la intervención de este Tribunal fue a destiempo porque no permitió al Tribunal de Primera Instancia celebrar una vista oral o evidenciaria.**[73]

---

[72] *Íd.*, págs. 2-3.  (Énfasis nuestro).

[73] *Íd.*, pág. 4.

Contrario a lo expuesto por el Juez Presidente señor Hernández Denton y la Jueza Asociada señora Fiol Matta, auscultamos a la saciedad los datos y hechos constatados en la exposición de motivos que justifican las medidas que el Estado se ha visto obligado a tomar para conjurar una crisis fiscal que nos afecta a todos.  Como bien expuso la Opinión mayoritaria:

> [L]a ley en cuestión presenta un cuadro fiscal de un Gobierno que se encuentra al borde del caos. Esta conclusión no está basada en meras especulaciones sin fundamento, sino en fuentes autorizadas, como lo son: la Junta de Planificación, el B.G.F. y los Informes de Transición 2008, de Presupuestos del Gobierno de Puerto Rico, de la OGP y del Departamento de Hacienda. *Véase*, Opinión mayoritaria, pág. 62.

Así, como medio probatorio, tomamos conocimiento judicial de esta crisis fiscal de la misma forma que lo hizo el Juez Presidente, señor Hernández Denton en su Opinión Disidente en Yiyi Motors, Inc. v. E.L.A., 2009 T.S.P.R. 159, 177 D.P.R.___ (2009), res. el 14 de octubre de 2009.  El señor Juez Presidente, en su Opinión Disidente en el presente recurso, señala que **"somos conscientes de la crisis fiscal que afecta las arcas del Estado y de los esfuerzos que están realizando los poderes constitucionales para atender esta situación"**.[74]  Así lo hizo este Tribunal en el pasado en los casos antes relacionados.  Nos parece claro que es innecesario efectuar una vista evidenciaria para establecer aquello de lo que ya "somos conscientes",

---

[74] *Íd*., pág. 13.  (Énfasis nuestro).

es decir, aquello que ya quedó probado mediante conocimiento judicial por este Tribunal en el pasado.

El legislador justificó en su extensa exposición de motivos, incluida en la Ley Núm. 7, *supra*, la razonabilidad y necesidad de las medidas alternas que ha tomado la Rama Ejecutiva para atender con carácter de urgencia la crisis que nos afecta. Eso no son meras alegaciones. Es la política pública establecida por ley. Sólo luego de ese análisis es que resolvimos, **dándole a la determinación de necesidad y razonabilidad que hizo el legislador, el grado de deferencia que ella merece en un estado de emergencia fiscal declarado legislativamente, en un sistema republicano de gobierno. En nuestro sistema constitucional, no es permisible que un juez celebre un juicio *de novo* para revisar la necesidad y sabiduría de una ley fiscal.**[75]

De otra parte, es meritorio referirnos a las expresiones que hizo el Juez Presidente, señor Hernández Denton en su Opinión Disidente respecto a la necesidad de celebrar una vista antes de hacer una determinación sobre la razonabilidad y necesidad de la medida, **"el Estado debe probar en los tribunales que la medida es razonable y necesaria".**[76] **No obstante, no le adscribió ese mismo rigor**

---

[75] Para una exposición sobre los poderes gubernamentales en situaciones de emergencia, *véanse*, 86 A.L.R. 1539; 96 A.L.R. 826 (base de datos actualizada y disponible en Westlaw, el 6 de febrero de 2010).

[76] Op. Disidente del Juez Presidente, señor Hernández Denton, pág. 6.

**al Estado en los casos de <u>Presidente de la Cámara v. Gobernador</u>, *supra*; y <u>Díaz Saldaña v. Acevedo Vilá</u>, *supra*. En éste último, este Tribunal tomó conocimiento judicial de que las medidas legislativas aprobadas en mayo de 2006, para conjurar la crisis fiscal, eran "razonables y necesarias", en ausencia de prueba alguna presentada por el Estado en ambos casos. Le impartió en aquel momento una absoluta, total y ciega deferencia al proceso realizado por las ramas políticas de gobierno.** Muy respetuosamente identificamos una **INCONSISTENCIA** entre aquel proceder y el actual.

El Juez Presidente, señor Hernández Denton añade en su Opinión Disidente que <u>U.S. Trust Co. of New York v. New Jersey</u>, *supra*, exige celebrar una vista evidenciaria. En ninguna parte de la Opinión emitida por el máximo foro federal se menciona tal cosa. Lo único que la normativa de dicho caso exige es que el Estado demuestre la necesidad y razonabilidad de la medida, dándole deferencia a la determinación del legislador por imperativo del principio y doctrina de la separación de poderes. Esto no quiere decir que la normativa federal obligue a la celebración de una vista evidenciaria como único mecanismo para que el Estado demuestre la necesidad y razonabilidad de la medida. En el caso ante nos, el Estado demostró mediante los hechos y datos que surgen de la exposición de motivos de la Ley 7, *supra*, que las medidas impugnadas eran razonables y necesarias. Atendiendo de esa forma, como cuestión de

derecho, el planteamiento sobre inconstitucionalidad del referido estatuto.

Con tal deferencia no estamos abdicando a nuestro rol constitucional. Todo lo contrario. No podemos, como pretenden los disidentes, "abdicar a nuestra función judicial" de salvaguardar el mandato constitucional de separación de poderes para convertirnos en un **SUPER GOBIERNO**. Nuestra Constitución nos lo prohíbe.

D.

La distinguida Juez Asociada, señora Rodríguez Rodríguez expresa en su Opinión Disidente que no puede avalar la Opinión del Tribunal porque, a su juicio, la decisión trastoca las vidas de miles de servidores públicos sin concederles a éstos su **verdadero día en corte.** Caracteriza la Opinión del Tribunal como **"galimatías constitucionales,** expuestas así, **sin un análisis jurídico riguroso que acompañe la extensa e innecesaria disertación, y carente, además, de evidencia que fundamente sus conclusiones".**[77] Sostiene que la decisión de este Tribunal valida, **"cual sello de goma",** los argumentos del Estado.[78] Sostiene que el trámite acelerado de certificación **para resolver apresuradamente** las controversias planteadas, hizo posible nuestra actuación, **"cual sello de goma".** **Puntualiza que el récord de estos casos esta huérfano de prueba que sostenga las conclusiones respecto a la Ley Núm.**

---

[77] Op. Disidente de la Juez Asociada, señora Rodríguez Rodríguez, págs. 1-2.

[78] *Íd.*, pág. 2.

**7, *supra*. Caracteriza de fatalidad el proceso adjudicativo llevado a cabo por este Tribunal porque los casos ante nos contienen, además de asuntos de derecho, controversias cuya resolución no es factible sin recibir prueba.**[79] La distinguida Juez Asociada expresa que las alegaciones realizadas por los demandantes de autos, relativa a discrimen por afiliación política, por razón de edad, menoscabo de obligaciones contractuales y violaciones al principio de mérito, antigüedad en el empleo, requerían, como mínimo, la presentación de prueba sobre las violaciones constitucionales señaladas.[80] Describe el proceso de expedir los recursos de certificación seguido por la mayoría como uno gobernado por la **"despreocupación de los miembros de la mayoría"** al certificar estos casos en un trámite, **"fast track o por descargue"**. Describe y señala el criterio judicial mayoritario al evaluar, analizar y disponer de los reclamos de los demandantes como uno que demuestra **"liviandad"**. Concluye que tal actuación vulnera los valores más elementales de debido proceso de ley y de un procedimiento justo.[81]

**A esos efectos, en la Opinión mayoritaria este Tribunal concluyó que las alegaciones sobre menoscabo a las obligaciones contractuales derivadas de los respectivos empleos de los demandantes de autos, de violaciones a la**

---

[79] *Íd.*

[80] *Íd.*

[81] *Íd.*, pág. 3.

**igual protección de las leyes, al principio del mérito y al debido proceso de ley de los demandantes, no necesitan de la presentación de prueba ante el Tribunal de Primera Instancia para disponer de ellas. Surge del estatuto y del proceso legislativo, al cual le adscribimos deferencia, el criterio de razonabilidad que gobierna este asunto. No obstante, en cuanto a los demás planteamientos de los demandantes de autos, devolvimos el caso al Tribunal de Primera Instancia para que celebre una vista evidenciaria para que puedan presentar prueba y sostenerlas.**

La Juez Asociada, señora Rodríguez Rodríguez en su Opinión Disidente se quejó de la falta de **"un análisis jurídico riguroso"** de la mayoría en la Opinión del Tribunal y de todas las otras terribles imputaciones que relacionamos previamente. Terminó uniéndose a la campaña de descrédito y demonización que denunció el Juez Asociado, señor Martínez Torres en la Opinión de Conformidad emitida en Yiyi Motors, Inc. v. E.L.A., *supra*.

**Como indicamos en nuestro en el Voto Particular del 2 de febrero de 2010, la Opinión del Tribunal se circuló veinte y nueve (29) días antes de la fecha de su certificación. Lo único que se emitió en "fast track" o a manera de descargue en este recurso, es decir, sin permitir reacción o debate, fueron las opiniones disidentes, que se certificaron en violación de la Regla 5(b) de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A, R.5(b).**[82]

---

[82] "No se podrá certificar ponencia alguna que no haya sido previamente circulada a todos(as) los(as) jueces por lo

Por otro lado, una imputación de parcialidad como la que la Juez Asociada, señora Rodríguez Rodríguez le hizo a los que discrepamos de ella, sería objeto de alguna medida disciplinaria si la hubiera lanzado un abogado. *Véase*, In re Cardona Álvarez, 116 D.P.R. 895 (1986). La inmunidad de la que gozamos nos permite hacer manifestaciones como esas sin enfrentar sanciones, como miembros de este Tribunal, pero no nos exime de la postura tradicional de ecuanimidad, de exhibir un temperamento judicial en nuestras actuaciones y ponencias escritas ni de la obligación moral de observar lo que exigimos a todos los abogados del País. Si abandonamos estos postulados perdemos la fuerza moral para exigir mesura a los abogados.

Por eso, este Tribunal, por voz del entonces Juez Asociado señor Hernández Denton, ha dicho en el pasado, citando al jurista Roscoe Pound, lo siguiente:

> Escribir una opinión disidente conlleva una responsabilidad. ... No hay cabida en las opiniones suscritas por jueces de un tribunal estatal de última instancia para la censura desmesurada, para la extrema vituperación, acusaciones de malsanas motivaciones a la opinión mayoritaria e insinuaciones de incompetencia, negligencia, prejuicio o insensibilidad por parte de los otros jueces del tribunal. ... Para justificar una disidente denunciatoria, la cuestión de derecho debe ser de considerable importancia. Para justificar una disidente en que se censura a un colega, si esto es al fin justificable, la cuestión de derecho debe ser excepcionalmente decisiva y los errores señalados de la más seria naturaleza. ... [L]a opinión de un juez de última instancia debe expresar sus

menos diez (10) días antes de ser certificada, a no ser que una mayoría así lo disponga o que por la naturaleza urgente del asunto se prescinda de dicho término aunque no de la circulación".

razones y no sus opiniones particulares. R. Pound, *Cacoethes Dissintiendi: The Heated Judicial Dissent*, 39 A.B.A.J. 794, 795 (1953).[83]

La disidencia vigorosa tiene un rol de suma importancia en un foro colegiado como éste. Bien empleado, un disenso presenta visiones alternas de una controversia. En ocasiones, abre nuevos caminos en el campo del derecho. No obstante, quienes recurren al ataque personal para sostener una opinión "claramente denotan la falta de argumentos válidos para avalar la misma o una falta de conocimiento o dominio sobre la materia". Granados v. Rodríguez Estrada II, *supra*, pág. 616, n. 1 (Opinión concurrente y de conformidad de la Jueza Asociada, señora Naveira de Rodón).

E.

En cuanto a la distinción entre un derecho adquirido y un interés propietario, bien se señala en la Opinión mayoritaria que un empleado tiene un interés propietario sobre la retención de su empleo siempre y cuando esté protegido por una ley o cuando las circunstancias crean una expectativa razonable de continuidad. Ahora bien, en lo referente al argumento de los peticionarios en cuanto a que éstos ostentan un derecho adquirido a la retención de sus empleos, la Opinión de este Tribunal precisa que ninguno de los estatutos previos, afectados por la Ley Núm. 7, *supra*, que decreta un estado de emergencia fiscal, le conferían a

---

[83] Granados v. Rodríguez Estrada II, 124 D.P.R. 593, 614, n.6 (1989) (*traducido en* Granados v. Rodríguez Estrada V, 127 D.P.R. 1, 7 (1990)).

los empleados públicos la posibilidad de permanecer en su empleo **indefinidamente**. Esto es, **sin que exista la posibilidad de que sean cesanteados por falta de trabajo o de fondos que permitan remunerar su trabajo realizado**. Más bien, todo lo contrario. Las leyes relacionadas al asunto en controversia contemplaban, aun antes de la aprobación de la Ley Núm. 7, *supra*, la posibilidad de que el empleado público fuera cesanteado aún cuando ello no respondiera a acciones disciplinarias entabladas en su contra, bajo las circunstancias antes descritas.

A pesar de lo anterior, al Juez Presidente, señor Hernández Denton y a la Juez Asociada, señora Rodríguez Rodríguez les resulta **"incomprensible"** la distinción que hace la mayoría del Tribunal al adjudicar el caso de epígrafe, en el cual no se le reconoce a los empleados cesanteados un derecho adquirido a retener sus empleos, *vis a vis* nuestra decisión de otorgar escoltas policiacas vitalicias a los ex gobernadores por éstos haber obtenido un derecho adquirido a esa protección. Sin embargo, ambos casos son claramente distinguibles.

En el caso de autos, los empleados cesanteados no tienen como parte de su patrimonio un derecho adquirido como consecuencia de un hecho idóneo realizado en virtud de una norma vigente que le **garantizara plenamente y en forma absoluta el derecho a retener su empleo**. Tampoco le es aplicable, como lo fue en el caso de las escoltas de los ex gobernadores, la doctrina de "re-enactment". Ello es así, toda vez que tanto la Ley del Sistema de Administración de

los Recursos Humanos, Ley Núm. 184 del 3 de agosto de 2004, *supra*, como la jurisprudencia de este Foro, reconocen la posibilidad de que un empleado público sea cesanteado si se dan ciertas condiciones y se cumple determinado procedimiento.

Primeramente, es menester aclarar que la Ley del Sistema de Administración de los Recursos Humanos, *supra*, define a los empleados de carrera como "aquéllos que han ingresado al servicio público en cumplimiento cabal de lo establecido por el ordenamiento jurídico vigente y aplicable a los procesos de reclutamiento y selección del servicio de carrera al momento de su nombramiento. **Tales empleados tienen derecho a permanecer en el servicio conforme se dispone en la Sección 6.6 de esta Ley**".[84]  No obstante, la referida Sección también señala lo siguiente:

> 9. Se podrán decretar cesantías en el servicio, sin que constituya acción disciplinaria o destitución, en las siguientes circunstancias:
>
> > a. **[D]ebido a la eliminación de puestos por falta de trabajo o de fondos.** En estos casos, las cesantías se decretarán dentro de los grupos de empleados cuyos puestos tengan el mismo título de clasificación y considerando dentro de cada grupo el status de los empleados, su productividad, hábitos y actitudes reflejadas en sus evaluaciones y su antigüedad en el servicio. A los fines de determinar antigüedad, se considerará todo servicio prestado en puestos de las agencias comprendidas en el Sistema.

---

[84] Ley del Sistema de Administración de los Recursos Humanos, Ley Núm. 184 de 3 de agosto de 2004, Art. 9, Sec. 9.1.

> La Autoridad Nominadora de cada agencia notificará por escrito a todo empleado a quien haya de cesantear con no menos de treinta (30) días de antelación a la fecha en que habrá de quedar cesante. Ninguna cesantía de empleados será efectiva a menos que se cumpla con el requisito de notificación. Cada agencia procederá a establecer un procedimiento escrito a los efectos de decretar cesantías en caso de éstas ser necesarias, el mismo será divulgado o estará disponible para conocimiento de cualquier empleado interesado.[85]

Como vemos, la propia ley previamente aprobada antes del estado de emergencia decretado legislativamente, permitía que al empleado regular de carrera se le privara del interés propietario que tiene sobre su puesto, siempre y cuando se realizara mediante un debido proceso de ley. En la medida en que el estatuto que concede el interés propietario también proveía para privarlo a causa de la falta de fondos para retribuirlo, ¿cómo podría entonces argumentarse que estos empleados poseen un derecho adquirido protegido constitucionalmente frente a **cualquier** gestión gubernamental que pretende intervenirlo?[86] Es precisamente esta realidad estatutaria la que nos conduce a concluir, como señalamos en la Opinión mayoritaria, que en el presente caso **"se encuentra ausente el elemento del amparo de una ley anterior que hubiere concedido tal**

---

[85] *Íd.*, Art. 6, Sec. 6.6 9(a), 3 L.P.R.A. § 1462e (9)(a). (Énfasis nuestro).

[86] *Véase* Hernández Colón, Romero Barceló v. Policía de P.R., 2009 T.S.P.R. 154, 177 D.P.R: ___ (2009), res. 13 de octubre de 2009.

derecho".[87] Recuérdese que "el derecho adquirido no puede ser el conjunto de facultades que la ley anterior permitía que los ciudadanos ejercitaran, ya que esto sería el estado de derecho objetivo que la nueva ley intenta cambiar".[88]

Los Jueces disidentes pretenden y sostienen, en el presente caso, que es función de este Tribunal someter a revisión judicial la formulación de política pública de la Legislatura de intervenir con las leyes previamente aprobadas y afectadas por la Ley Núm. 7, *supra*, al declarar un **estado de emergencia fiscal**. Para ello, entienden que es necesario e imprescindible que se pase prueba ante el Tribunal de Primera Instancia sobre la crisis fiscal de la Rama Ejecutiva, la determinación legislativa sobre la emergencia fiscal de la Rama Ejecutiva y sobre las diferentes y variadas opciones que dispuso la Asamblea Legislativa para conjurarlas. Lo anterior, es improcedente y, además, es **INCONSISTENTE** con lo actuado por este Tribunal en el pasado en los casos previamente mencionados y que tienen relación directa con el asunto ante nos.

Todo lo anterior contrasta claramente con la situación de los ex gobernadores, los cuales sí obtuvieron un derecho adquirido que no puede ser alterado retroactivamente por una ley aprobada después de su adquisición. Esos derechos "tienen `tal fuerza y autonomía´ derivada de la norma jurídica que los instituyó, que pueden oponerse con `toda

---

[87] Op. del Tribunal, pág. 76. (Énfasis nuestro).

[88] Consejo de Titulares v. William Hospitality, 168 D.P.R. 101, 109 (2006).

la magnitud de su fuerza´ a cualquier intento de destruirlos o ignorarlos que provenga de una ley posterior".[89]

Ahora bien, al Juez Presidente, señor Hernández Denton le resulta "sorprendente" la conclusión que alcanzamos en el caso de autos a los efectos de que los empleados públicos no gozan de un derecho adquirido sobre sus empleos, pues entiende que el ordenamiento jurídico relacionado con el personal de servicio público le reconoce tal derecho. Nada más lejos de la verdad establecida por nuestro ordenamiento jurídico. Además, le parece "incomprensible" la distinción que realizamos entre este caso y la decisión de reconocerles a los ex gobernadores un derecho adquirido sobre sus escoltas policiacas. Para ello, se fundamenta en que "en el caso de las escoltas de los ex gobernadores no existía disposición legal alguna que expresamente les reconociera el derecho que reclamaban".[90]

Sin embargo, tal como precisamos en Hernández Colón, Romero Barceló v. Policía de P.R., supra, "los derechos adquiridos, **sin importar su procedencia**, ya sea mediante legislación, por contrato o por 'derecho común' gozan de la misma protección que todo derecho constitucional".[91] Lo

---

[89] Asociación de Maestros v. Departamento de Educación, 2007 T.S.P.R. 123, 171 D.P.R. ___ (2007), res. 15 de junio de 2007 (Op. Disidente de la Jueza Asociada, señora Fiol Matta, pág. 16). (Citas omitidas).

[90] Op. Disidente del Juez Presidente, señor Hernández Denton, pág. 11.

[91] Hernández Colón, Romero Barceló v. Policía de P.R., supra, pág. 28.

importante es identificar si en efecto, el peticionario ostenta un derecho adquirido que se incorporó a su patrimonio al haber consumado el hecho que el estado de derecho vigente le proveía para que se configurara como tal.

En el caso de las escoltas de los ex gobernadores, el estado de derecho se concretó a raíz de la validez impartida por la Legislatura a la interpretación otorgada durante décadas por la Policía a su propia Ley Orgánica, lo que provocó que esa interpretación administrativa de la Ley y el reconocimiento de la adquisición de un derecho adviniere a rango de norma vigente. Los ex gobernadores confiaron y se condujeron hacia la obtención del derecho de protección que ese estado de derecho les proveía, sin limitación alguna. Los ex mandatarios adquirieron tal derecho en virtud del hecho consumado contemplado por el ordenamiento jurídico, de sus respectivos retiros como primeros ejecutivos del País.

**Con relación a todo lo anterior, es menester señalar que aunque la situación económica y fiscal del País al momento de privarle las escoltas a los ex gobernadores era de déficit fiscal de la Rama Ejecutiva en su totalidad, surge claramente de los autos en <u>Hernández Colón, Romero Barceló v. Policía de P.R.</u>, *supra*, que el pasado Superintendente, licenciado Pedro Toledo Dávila, reconoció que el gasto por el uso de escoltas era mínimo y su eliminación no representaría una economía significativa en los recursos económicos de la Policía de Puerto Rico,**

**necesarios para prestar el servicio público llamado a ofrecer. La Policía de Puerto Rico no se encontraba en ese momento en un estado de emergencia fiscal declarado por la Legislatura. Esto contrasta significativamente con la situación de los empleados públicos aquí cesanteados, pues, como señalamos en la Opinión mayoritaria del caso de autos, sus cesantías representan un ahorro sustancial proyectado de por lo menos $510,000,000 al año, que de no producirse afectaría significativamente el servicio público llamado a prestarse por la Rama Ejecutiva en variadas y sensitivas áreas del servicio público. La Rama Ejecutiva, en su totalidad, se encontraba, al momento de los despidos, en un estado de emergencia declarado por el Poder Legislativo.**

Los empleados públicos cesanteados ostentaban un interés propietario sobre sus empleos, pero el estado de derecho vigente no les otorgaba la posibilidad de consumar un hecho que diese lugar a que la retención de ese empleo se conformara como un derecho adquirido que entrara a formar parte de su patrimonio. Ello es así, pues como hemos expresado, el propio ordenamiento jurídico provee para que, mediante un debido proceso de ley, **"[se pueda] decretar cesantías en el servicio, sin que constituya acción disciplinaria o destitución [en caso de] la eliminación de puestos por falta de trabajo o de fondos"**.[92] Y ello es precisamente lo que provocó la implantación del

_____

[92] Ley del Sistema de Administración de los Recursos Humanos, *supra*, Art. 6, Sec. 6.6 9(a), 3 L.P.R.A. § 1462e (9)(a).

plan de cesantías promulgado tras la aprobación de la Ley Núm. 7, *supra*, la falta de fondos en las arcas del Gobierno para satisfacer la nómina y el sueldo o salario de los miles de empleados que han sido cesanteados.

Sorprendentemente, para la Jueza Asociada, señora Fiol Matta el análisis que acabamos de realizar **"no tiene fundamento jurídico alguno"**.[93] La compañera Jueza Asociada se pregunta: "¿Cómo es posible que de la interpretación de un artículo de la Ley de la Policía surja un derecho adquirido a escoltas, mientras que ante la existencia de toda nuestra legislación laboral y el contrato de trabajo individual se argumenta que sólo surge un interés propietario, pero no un derecho adquirido?"[94]

Resulta que cuando la Asamblea Legislativa revisa alguna ley y deja intactas algunas de las disposiciones de ésta que han sido interpretadas de determinada manera por la agencia llamada a su cumplimiento, y cuya interpretación es de conocimiento de la Legislatura, "los tribunales deberán determinar que la decisión de la Asamblea Legislativa fue de preservar y validar la interpretación brindada por la agencia correspondiente a tal disposición, como parte del estado de derecho vigente".[95] De esta forma, esa interpretación adquiere rango de norma vigente, y como

---

[93] Op. Disidente de la Jueza Asociada, señora Fiol Matta, pág. 24.

[94] *Íd.*, págs. 24-25.

[95] Hernández Colón, Romero Barceló v. Policía de P.R., *supra*, págs. 22-23.

tal, capaz de convertir a particulares en titulares de derechos adquiridos.

A estos efectos, como muy bien expone la compañera Jueza Asociada, señora Fiol Matta citando a Santos Briz: "para que pueda hablarse de derechos adquiridos, propiamente tales, es necesario que se trate de situaciones subjetivas, cuya extensión y alcance son determinados por un acto o negocio jurídico, **no directamente por ley**, que se limita a hacer posible la conclusión de ese acto o negocio".[96] Es desde esta perspectiva que "es posible que de la interpretación de un artículo de la Ley de la Policía surja un derecho adquirido a escoltas",[97] pues los ex gobernadores comenzaron a hacer uso de éstas, a tenor con el estado de derecho vigente, al momento de consumarse y de ser efectivo el hecho de su retiro y por ende la activación de tal derecho.

Distinguible es la situación de los empleados públicos cesanteados. Como ya hemos demostrado, el estado de derecho vigente al momento de su contratación y antes de la declaración legislativa sobre estado de emergencia fiscal **contemplaba la posibilidad de que éstos algún día fueran cesanteados a causa de la falta de trabajo o de fondos con los cuales remunerar su trabajo**. En vista de que fue bajo esas condiciones que ingresaron al gobierno como empleados públicos, no existe fundamento que permita concluir, de

---

[96] Op. Disidente de la Jueza Asociada, señora Fiol Matta, pág. 21. (Énfasis nuestro).

[97] *Íd*., pág. 24.

forma alguna, que estos empleados ostentan un derecho adquirido sobre sus empleos. Ante la realidad de toda nuestra legislación laboral y el contrato de trabajo individual, éstos sólo gozan de un interés propietario sobre sus puestos de trabajo, del cual se les puede privar mediante un debido proceso de ley, atendida la situación de crisis y de emergencia fiscal de la Rama Ejecutiva y que afecta directa o indirectamente a cientos de miles de puertorriqueños.

VI

**Recurso de Certificación Intrajurisdiccional**

Los tres (3) jueces disidentes son del criterio que la mayoría expidió el auto de certificación solicitado en el presente asunto en forma **"apresurada" sin permitir al Tribunal de Primera Instancia la construcción de un récord judicial mediante la celebración de una vista evidenciaria que le permitiera a las partes presentar prueba y esgrimir argumentos orales ante ese foro primario. Le imputan a la mayoría no haber evaluado el presente asunto con cuidado y que no fue analizado desde diferentes perspectivas. Sostienen que la mayoría expidió el referido auto prematuramente "para apresurarse a resolver el asunto constitucional". Le imputa la Jueza Asociada, señora Fiol Matta a la mayoría que no cumplieron con su función judicial de adjudicación en "forma mesurada y con justificación jurídica",** o sea, que la decisión de este Tribunal carece de juridicidad que la sostenga. Concluye, que la mayoría circunvaló el trámite ordinario de los casos

de epígrafe a pesar que de los expedientes de los mismos ante nos solamente constaban la petición de certificación, la demanda y los alegatos de las partes.

La distinguida Jueza Asociada, señora Fiol Matta trata de distinguir lo aquí señalado como improcedente de lo acaecido durante los meses de noviembre y diciembre de 2004, en los casos de Suárez v. C.E.E. I, *supra*; y Suárez v. C.E.E. II, *supra*.

### **Suárez v. C.E.E. I**, *supra*; **Suárez v. C.E.E. II**, *supra*

El 2 de noviembre de 2004, se celebraron en Puerto Rico las elecciones generales. Tras el conteo inicial la Comisión Estatal de Elecciones, en adelante C.E.E., certificó preliminarmente como Gobernador electo al licenciado Aníbal Acevedo Vilá, candidato del Partido Popular Democrático, en adelante P.P.D. En aras de certificar oficialmente a los candidatos electos en los pasados comicios electorales, el 12 de noviembre de 2004, la C.E.E. comenzó el escrutinio general.

Comenzado el referido procedimiento, el Comisionado Electoral del Partido Nuevo Progresista, en adelante P.N.P., objetó la validez de todas aquellas papeletas en las cuales los electores votaron bajo la insignia del Partido Independentista Puertorriqueño, en adelante P.I.P., y a su vez brindaron un voto al licenciado Aníbal Acevedo Vilá, como candidato a Gobernador y al licenciado Roberto Pratts Palerm, como candidato a Comisionado Residente. A juicio del Comisionado Electoral del P.N.P., en esas circunstancias dichos votos eran nulos, ello, por no haber

forma de determinar la intención del elector. El Comisionado Electoral del P.P.D. se opuso a esa solicitud. Entendió que el voto impugnado se debía considerar como un voto mixto. El Presidente de la C.E.E. determinó que se trataba de una papeleta de voto mixto y que procedía adjudicarse como tal.

Posteriormente, el señor Manuel R. Suárez Jiménez y un grupo de electores que alegadamente emitieron el tipo de voto antes descrito acudieron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, mediante una "Petición de Sentencia Declaratoria e Injuction", a pesar de que no fueron afectados por la decisión del Presidente de la C.E.E. sino por el contrario favorecidos por ella. Pretendían, a través del referido procedimiento iniciado por ellos ante el foro primario, que se decretara judicialmente la validez de su voto, remedio que ya le había concedido la C.E.E.

El Comisionado Electoral del P.N.P. solicitó al Tribunal de Primera Instancia la desestimación de la demanda por entender que ese tribunal no tenía jurisdicción por no existir un **"caso y controversia"**, ya que los demandantes de autos no habían sido afectados por la decisión del Presidente de la C.E.E. sino favorecidos por ella. El foro primario dictaminó en corte abierta declarando con lugar la solicitud de desestimación de la demanda. Posteriormente redujo a escrito su dictamen.

Inconforme con la referida determinación del Tribunal de Primera Instancia, el Sr. Suárez Jiménez acudió ante

este Tribunal mediante un recurso de certificación intrajurisdiccional. Adujo que el foro primario incidió al no concederle los remedios por él solicitados para garantizar el tipo de voto por él emitido y de aquellos electores que como él alegadamente emitieron su voto de la misma forma. Inmediatamente emitimos una Resolución, acortando los términos reglamentarios, para que las partes se expresaran en torno a si procedía nuestra intervención. Con el beneficio de la comparecencia de las partes, sin legitimación activa de los demandantes de autos ante el Tribunal de Primera Instancia ni ante nos, sin jurisdicción de ambos foros por no haber un **"caso y controversia justiciable"**, a tenor con E.L.A. v. Aguayo, *supra*, sin un ápice de prueba presentada ante el foro primario, por no haberse celebrado vista evidenciaria alguna y en ausencia de un récord completo construido por el foro primario, el 20 de noviembre de 2004 este Tribunal resolvió expedir el auto de certificación solicitado y simultáneamente dispuso de la totalidad del asunto. Este Tribunal decretó que era válido el voto emitido por los demandantes de autos en la papeleta estatal que contenía una cruz bajo una de las insignias de los partidos y una cruz en cada uno de los encasillados correspondientes a los candidatos a los puestos de Gobernador y de Comisionado Residente de otros partidos políticos. Concluimos, entonces, que resolver lo contrario implicaba contravenir el ordenamiento electoral de Puerto Rico en menoscabo del **derecho constitucional al sufragio.** Ordenamos a la C.E.E., a su Presidente, a los

Comisionados Electorales y a todos los funcionarios de esa dependencia gubernamental a que contaran y adjudicaran como válidas todas las papeletas marcadas de esa forma por los electores, a pesar de que ya esa dependencia gubernamental había dispuesto de la misma forma previamente.

El entonces Juez Asociado, señor Fuster Berlingeri emitió una Opinión de Conformidad. El 23 de noviembre de 2004, emitimos una Opinión Disidente con posterioridad a la certificación mayoritaria pues, el 20 de noviembre de 2004, se le concedió a los jueces que no compartían el criterio mayoritario apenas **tres (3) horas** para expresarse, a pesar del término reglamentario de **treinta (30)** días para así hacerlo. La mayoría de entonces acortó el referido término reglamentario a tres (3) horas a aquellos jueces que no compartían su criterio. La Jueza Asociada, señora Fiol Matta se queja que en el presente caso se redujo el mismo término a **veinte y nueve (29) días.**

Nuestra Opinión Disidente giró fundamentalmente sobre el impedimento de este Tribunal de emitir su dictamen por falta de jurisdicción por haber sido presentado, ante nos, previo a su emisión, copia de un escrito de "Notice of Removal" radicado ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico con el propósito de trasladar ese caso ante el foro judicial primario federal, entre otros fundamentos. Añadimos, entonces, respecto a aquel asunto lo siguiente:

> Este Tribunal, a pesar de su nombre (Tribunal Supremo), no tiene autoridad para imprimirle a sus facultades una dimensión que la Constitución

de Puerto Rico no le ha otorgado. Tampoco puede arrogarse la jurisdicción del tribunal federal, de acuerdo con el ordenamiento estatutario federal. El Tribunal de Primera Instancia y este Tribunal sólo pueden emitir decisiones vinculantes para las partes que acuden ante ellos cuando se les presenta un "caso y controversia" y tienen jurisdicción para así hacerlo. Concluimos que el asunto ante nos no es justiciable bajo el Derecho puertorriqueño, porque los demandantes de autos, aquí peticionarios, no tienen legitimación activa para promover su pleito y no han presentado un "caso y controversia" ante el Tribunal de Primera Instancia y este Tribunal. Este Tribunal carece de jurisdicción para actuar bajo el derecho estatutario federal y el derecho constitucional puertorriqueño. Concluimos, además, que los peticionarios pretenden de este Tribunal la emisión de una opinión consultiva que les favorezca, a lo cual ha accedido la Mayoría en completo y absoluto menosprecio a los principios constitucionales puertorriqueños y de Estados Unidos, antes mencionados. La actuación altamente irregular y apresurada de la Mayoría en este asunto priva de legitimidad a este Tribunal, pues de acuerdo con el derecho estatutario federal y nuestro derecho constitucional, no resulta vinculante su decisión, además de restarle confiabilidad y credibilidad ante la ciudadanía.[98]

Los Jueces disidentes señalan que la mayoría del Tribunal llevó a cabo, en los casos de epígrafe, un trámite judicial apresurado que resulta contrario al debido proceso de ley. No compartimos tal criterio. No obstante, para esos Jueces no fue apresurado ni violatorio al debido proceso de ley el curso de acción y el trámite acelerado escogido por la entonces mayoría en Suárez v. C.E.E. I, supra; y Suárez v. C.E.E. II, supra, cuando estaba involucrado y se discutía el efecto práctico sobre la elección general celebrada el 2 de noviembre de 2004, del

---

[98] Suarez v. C.E.E. II, supra, págs. 393-394.

**derecho fundamental al sufragio de cientos miles de electores puertorriqueños**.

La presente crisis fiscal no es nueva. Desde el 2005, este Tribunal ha tenido ante sí reclamos de la Rama Ejecutiva sobre la crisis fiscal y los compañeros Jueces que ahora disienten nunca cuestionaron la realidad ni la magnitud de la misma. Ahora, cuando la crisis fiscal está ampliamente documentada y se han legislado varias medidas para conjurarla, esos mismos Jueces consideran los hallazgos legislativos como si fueran meras alegaciones y pretenden que un tribunal evalúe *de novo* la crisis y la necesidad de las medidas fiscales tomadas por los funcionarios que el Pueblo eligió. En el presente caso no le imparten deferencia alguna a ese proceso legislativo.

Ese no es el rol de los tribunales en nuestra democracia representativa. Los tribunales no pueden asumir el papel que legítimamente corresponde al proceso político. Si los jueces protagonizamos ese rol el Pueblo pierde.

Tomamos conocimiento judicial de los múltiples hallazgos legislativos que establecen la existencia de una profunda y muy seria crisis fiscal y presupuestaria que data de varios años. Partiendo de esa política pública legislada, analizamos la constitucionalidad de las medidas tomadas por el Gobierno que se impugnaron en los recursos consolidados de epígrafe.

Al convalidar desde el ángulo constitucional la Ley Núm. 7, *supra*, no emitimos juicios valorativos sobre la sabiduría del estatuto. Tal asunto no nos corresponde.

Como Jueces, nos limitamos al análisis constitucional de la controversia, bajo las normas establecidas en el ordenamiento jurídico vigente. **Nuestra guía ha sido, es y siempre será la honestidad intelectual y la consistencia jurídica.**

*Efraín E. Rivera Pérez*
*Juez Asociado*

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Olga Domínguez Castro y otros *
    Recurridos *
                      *

            v. *    CT-2009-4
                      *

Gobierno del Estado Libre *
Asociado de P.R. y Otros *
    Peticionarios *
*******************************
Kristy J. González Bou y otros *
    Recurridos *
                      *

            v. *    CT-2009-5
                      *

Estado Libre Asociado de P.R. *
y Otros *
    Peticionarios en *
    Certificación *
*******************************
Zoraida Martínez Román y otros *
    Recurridos *
                      *

            v. *    CT-2009-6
                      *

Estado Libre Asociado de P.R. *
y Otros *
    Peticionarios *
*******************************
Erika Vispo Figueroa *
    Recurrida *
                      *

            v. *    CT-2009-9
                      *

Estado Libre Asociado de P.R. *
y Otros *
    Peticionarios *
*******************************

Voto Particular emitido por el Juez Presidente SEÑOR HERNÁNDEZ DENTON al cual se une la Juez Asociada SEÑORA RODRÍGUEZ RODRÍGUEZ

San Juan, Puerto Rico, a 19 de febrero de 2010.

    Examinado el Voto Particular emitido por el compañero Juez Asociado señor Rivera Pérez, reiteramos los pronunciamientos expresados en la Opinión Disidente que suscribimos el pasado 2 de

febrero de 2010. A pesar de los esfuerzos de la mayoría del Tribunal para, mediante el referido voto, incorporar nuevos fundamentos que justifiquen su decisión de decretar la constitucionalidad de la Ley Núm. 7 de 9 de marzo de 2009 sin haberse presentado prueba alguna, nada hallamos en dicha ponencia explicativa, a la que se unieron los compañeros Jueces Asociados señor Martínez Torres, señora Pabón Charneco y señor Kolthoff Caraballo, que nos permita aceptar la tesis de la Opinión del Tribunal en el caso de autos.

Más bien, este segundo esfuerzo de la mayoría por fundamentar la Opinión certificada originalmente, suscita interrogantes adicionales sobre el trámite expedito de un caso en el que las partes realmente no tuvieron su día en corte. Además, dicho voto reconoce implícitamente que la Opinión emitida carece de los fundamentos necesarios para cumplir con el peso de la prueba requerido por United States Trust Co. v. New Jersey, 431 U.S. 1 (1977), en aquellos casos en que se cuestiona una actuación del Estado que menoscaba severamente sus obligaciones contractuales.

Justamente, con el propósito de reafirmar nuestro desacuerdo con el trámite judicial seguido en los casos de autos -el que por la falta absoluta de prueba que pudiese ser dilucidada por los tribunales redundó en una violación del debido

proceso de ley de los empleados públicos involucrados— hemos decidido suscribir este breve Voto Particular. El curso de acción seguido por la mayoría del Tribunal nos lleva por senderos incorrectos en derecho y con graves implicaciones para el sustento de los empleados públicos afectados.

I.

En esencia, en la ponencia suplementaria del compañero Juez Asociado señor Rivera Pérez se indica —a modo de apología a la reciente Opinión emitida por el Tribunal en los casos de autos— que la presentación de prueba resultaba innecesaria para resolver la controversia sobre la constitucionalidad de la Ley Núm. 7, *supra*, y que procedía otorgarle deferencia a la actuación del Estado. Para sustentar dicha justificación, el escrito explicativo señala que en Romero Barceló v. E.L.A, 169 D.P.R. 460 (2006); Díaz Saldaña v. Acevedo Vilá, 168 D.P.R. 359 (2006) (Sentencia); y en Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006), este Tribunal dispuso de las controversias allí planteadas sin exigir prueba sobre la condición fiscal del país.

Basta con examinar dicha jurisprudencia para concluir lo obvio: ninguno de esos casos involucraba una controversia sobre la prohibición constitucional contra el menoscabo de obligaciones contractuales, como ocurrió en los casos de autos. Más bien, en

aquellas ocasiones se trató de conflictos de poder entre las ramas políticas de nuestro Gobierno. No hubo, como sí ocurre en los casos de autos, una impugnación de una actuación gubernamental que interviniera con los derechos constitucionales de miles de ciudadanos.

De ahí que en los casos relacionados con la validez de la Ley Núm. 7, *supra*, opináramos que debía cumplirse con el estándar de adjudicación pautado por el Tribunal Supremo de Estados Unidos en United States Trust Co. v. New Jersey, *supra*, y adoptado por este Tribunal en Bayrón Toro v. Serra, 119 D.P.R. 605 (1987), a los efectos de que cuando el Estado se propone menoscabar sus propias obligaciones contractuales éste debe demostrar que la medida seleccionada es razonable y necesaria. Esta evidente y fundamental distinción, a nuestro pesar, no sólo se ignoró en la Opinión emitida por el Tribunal, sino que ahora, una vez más, se soslaya en el Voto Particular del compañero Juez Asociado señor Rivera Pérez.

Específicamente, los pronunciamientos del referido escrito suplementario pierden de vista que el hecho de que se haya tomado conocimiento judicial de la precaria situación fiscal, o que seamos conscientes de ésta, no releva al Estado de cumplir con el estándar de adjudicación de United States Trust Co. v. New Jersey, *supra*. La estrechez

presupuestaria que sufre el erario es innegable y, como bien se señala en el Voto Particular, así lo hemos reconocido en ocasiones anteriores.

No obstante, ello no implica que la medida que haya tomado el Estado para superar sus dificultades económicas cumpla con el crisol constitucional exigido ante una alegación de que ha mediado un menoscabo severo de obligaciones contractuales. Para que esto ocurra, es necesario que se demuestre que, ante la difícil situación fiscal, la medida adoptada sea necesaria; es decir, que no hayan existido otras alternativas menos drásticas. United States Trust Co. v. New Jersey, *supra,* pág. 30. Con el mayor de los respetos a los compañeros de la mayoría, a nuestro juicio, el presumir que con la existencia de una crisis fiscal se demuestra, sin más, que la alternativa seleccionada por el Estado es necesaria, constituye un razonamiento que, en efecto, convierte en letra muerta la protección que ofrece la garantía constitucional contra el menoscabo de obligaciones contractuales.

Al emitirse la Opinión del Tribunal en los casos de epígrafe, disentimos por entender que la mayoría de los miembros de este Foro no comprendió que el propio trámite judicial establecido por este Tribunal impidió la presentación de prueba que demostrara que la medida tomada por el Estado era la menos gravosa. **Nuestra preocupación sigue latente y**

**la reiteramos: al no permitirles a las partes presentar prueba, se incumplieron con los parámetros de la normativa constitucional federal, lo que nos colocó al margen de las garantías mínimas establecidas en la Constitución de Estados Unidos sobre la prohibición contra el menoscabo de obligaciones contractuales y, a su vez, redundó en que a los empleados públicos involucrados se les violara el debido proceso de ley.**

Asimismo, la ponencia explicativa emitida en el día de hoy va aún más lejos que la Opinión certificada originalmente pues, al referirse a United States Trust Co. v. New Jersey, *supra*, elude la normativa allí pautada y señala incorrectamente que "el propio Tribunal Supremo Federal reconoce y postula como necesario conceder alguna deferencia a la actuación estatal. Así lo ha concedido el más alto foro federal." Voto Particular, pág. 48. Según indicáramos en nuestro disenso, lo que resolvió el Tribunal Supremo de Estados Unidos en la referida jurisprudencia es que cuando el Estado adopta una medida que menoscaba sus propias obligaciones contractuales éste debe probar ante el foro judicial que no existen alternativas menos onerosas. United States Trust Co. v. New Jersey, *supra*, pág. 30.

La mayoría de este Tribunal no sólo rehúye esa realidad, sino que actúa de manera inconsistente con su propia apreciación de la normativa federal al

reconocer que el curso de acción por el cual optó en los casos de autos realmente descansó de manera **absoluta** en el juicio legislativo plasmado en la Exposición de Motivos de la Ley Núm. 7, *supra*. Así lo revela el propio Voto Particular, pues en éste se manifiesta –para que no quede duda– que la mayoría del Tribunal "auscult[ó] a la saciedad los datos y hechos constatados en la **exposición de motivos** que justifican las medidas que el Estado se ha visto obligado a tomar", y que el Estado "demostró mediante los hechos y datos **que surgen de la exposición de motivos de la Ley 7**, *supra*, que las medidas impugnadas eran razonables y necesarias". (Énfasis nuestro). Voto Particular, págs. 58 y 60. Fue precisamente esta deferencia completa al juicio legislativo la que se descartó en United States Trust Co. v. New Jersey, *supra*, cuando el propio interés del Estado está en juego. United States Trust Co. v. New Jersey, *supra*, págs. 25-26. Peor aún, en el referido escrito suplementario se indica, so pretexto de una supuesta "consistencia jurídica", que en los casos de autos la presentación de prueba resulta innecesaria. Voto particular, pág. 82.

Así, pues, desafortunadamente, la mayoría del Tribunal no logra entender la importancia y necesidad de que en este caso se hubiese recibido prueba para adjudicar adecuadamente la alegación de los empleados públicos afectados de que la actuación

del Estado infringe la prohibición constitucional contra el menoscabo de obligaciones contractuales, plasmada tanto en la Constitución del Estado Libre Asociado de Puerto Rico como en la Constitución de los Estados Unidos. Art. II, Sec. 7, Const. E.L.A., L.P.R.A. Tomo 1; Art. 1, Sec. 10, Const. E.E.U.U., L.P.R.A. Tomo 1. Con su proceder, al relevar al Estado de presentar prueba, en realidad se le privó de un foro ante el cual pudiera sostener su tesis de que la medida tomada era la menos drástica.

**En atención a dicha alegación, luego de expedir los respectivos recursos de certificación este Tribunal tenía varias alternativas. Pudo, a modo de excepción y considerando la naturaleza del caso, haber celebrado una vista evidenciaria ante el Tribunal en pleno. 4 L.P.R.A. Ap. XXI-A, R. 4 (c). Pudo, además, haber designado un Comisionado Especial para que recibiera la prueba y para que, en cumplimiento con esa encomienda, nos rindiera un informe que nos colocara en posición de dirimir justamente las alegaciones de las partes. 4 L.P.R.A. Ap. XXI-A, R. 50. Asimismo, pudo haber remitido los casos al Tribunal de Primera Instancia para que se desarrollara, ante ese foro, el expediente necesario para resolver la controversia ante nos.**

Sin embargo, en los tres meses que estuvieron los recursos de epígrafe ante la consideración de este Foro, la mayoría del Tribunal no estableció

procedimiento alguno para recibir la prueba correspondiente. Optó, en cambio, por despachar la controversia a base de unos expedientes lacónicos, a todas luces desprovistos de los elementos necesarios para adjudicar el asunto, pues éstos sólo consisten de las demandas, las peticiones de certificación y los alegatos de las partes. De este modo, el proceder del Tribunal constituye, fundamentalmente, una violación al debido proceso de ley de los empleados públicos involucrados, pues adjudicó y decretó la constitucionalidad de la Ley Núm. 7, *supra*, sin la prueba necesaria para ello, dando por ciertas unas alegaciones del Estado que nunca pudieron ser refutadas.

Adviértase, además, que al certificar los recursos de epígrafe y obviar todo trámite posible para la presentación de prueba, el Tribunal, para efectos prácticos, **convirtió las peticiones de certificación del Estado en mociones de desestimación y así las adjudicó**. Esto, a pesar de que, conforme con nuestro ordenamiento procesal, al disponer de mociones de esa índole, el tribunal debe tomar como ciertos todos los hechos bien alegados en la demanda e interpretar dichas alegaciones liberalmente y de la manera más favorable posible para la parte demandante. 32 L.P.R.A. Ap. III, R. 10.2; Autoridad de Tierras v. Moreno Ruiz, res. el 24 de julio de 2008, 2008 T.S.P.R. 128. Tampoco se

favorece la moción de desestimación como mecanismo procesal para disponer de casos de alto interés público. *Íd.* **En los casos de autos, por el contrario, la metodología empleada por la mayoría del Tribunal fue a la inversa: tomó por ciertas las alegaciones del demandado —el Estado— en sus comparecencias ante nos y desestimó los reclamos de los demandantes —los empleados públicos.**

De otra parte, la ponencia suplementaria tampoco nos convence sobre el intento hecho por la mayoría de este Tribunal para distinguir cómo le concedió a los ex gobernadores un derecho vitalicio al servicio de escoltas policiacas –aún en momentos de crisis fiscal y sin la existencia de una ley que así lo estableciera– mientras que se negó a reconocerle a los servidores públicos afectados los derechos adquiridos sobre sus empleos al amparo de las leyes relacionadas con el sistema de personal de servicio público. Nótese que la decisión del Primer Ejecutivo en el caso de las escoltas también se tomó en el marco de una precaria situación fiscal, y respondió a la necesidad de tomar medidas de austeridad para reducir el gasto público. Al afirmar que el gasto por el servicio de las referidas escoltas es "mínimo" mientras que las cesantías impugnadas representan un "ahorro sustancial" para el erario, el Voto Particular soslaya de forma patente la

necesidad de que en ambos casos se presentara prueba. Voto Particular, págs. 71-72.

Como expresáramos en nuestra Opinión Disidente, "la decisión del caso de las escoltas contrasta drásticamente con el curso de acción que adopta el Tribunal en el caso de autos. Contrario al reclamo de los ex gobernadores, el de los empleados públicos cesanteados se basa en las disposiciones expresas de un ordenamiento que les garantiza el principio de mérito en el servicio público y les otorga derechos propietarios. No podemos avalar que ante el reclamo de sus derechos, no sólo adquiridos, sino expresamente conferidos por ley, se adopte un criterio distinto al pautado en el caso de las escoltas de los ex gobernadores." Reafirmamos, además, nuestro criterio de que el proceder del Tribunal "priva a los empleados públicos afectados de sus derechos adquiridos sin tan siquiera haberles provisto un proceso judicial completo y transparente, lo que lamentablemente tendrá el efecto de socavar la legitimidad de la decisión de este Tribunal y contribuirá a crear aún más desconfianza sobre la sabiduría y la validez de la acción tomada por el Estado para resolver sus problemas fiscales".

II.

En fin, reiteramos los pronunciamientos emitidos en nuestra Opinión Disidente del pasado 2

de febrero de 2010 sobre los efectos contraproducentes que tuvo el trámite judicial apresurado de los casos de epígrafe en la adjudicación de la constitucionalidad de la Ley Núm. 7, *supra*. En particular, el curso de acción procesal seguido en estos casos por una mayoría del Tribunal no permitió la presentación de prueba ante el foro de instancia. Tampoco se diseñó mecanismo alguno para que, en su defecto, esta Curia recibiera dicha prueba. Así, al presumir como ciertas las alegaciones del Estado según fueron consignadas en la Exposición de Motivos de la Ley Núm. 7, *supra*, sin permitir que éstas fueran sustentadas adecuadamente por el Estado ni refutadas por los demandantes, se colocó a la parte afectada –los empleados públicos– en un estado de indefensión. Ello ejemplifica el tipo de actuación que nuestro estado de derecho siempre ha pretendido evitar: la toma de decisiones judiciales en clara contravención a las garantías mínimas del debido proceso de ley.

En vista de ello, y reexaminadas las peticiones de certificación, los alegatos de las partes, la Opinión del Tribunal y el Voto Particular del compañero Juez Asociado señor Rivera Pérez, reafirmamos los criterios expuestos en nuestra Opinión Disidente. **Advertimos, además, que con el proceder de la mayoría del Tribunal continuamos al margen de la normativa establecida por el Tribunal**

**Supremo de Estados Unidos en <u>United States Trust Co.</u>
<u>v. New Jersey</u>**, *supra*, **caso que rige la presente
controversia.**


                              Federico Hernández Denton
                                  Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Olga Domínguez Castro, Sandra J. Guzmán Hernández, Militza López Mateo, Carlos Rivera Figueroa<br><br>Recurridos<br><br>v.<br><br>Gobierno del Estado Libre Asociado de Puerto Rico, Secretario de Justicia, Honorable Luis Fortuño, Gobernador del Estado Libre Asociado de Puerto Rico, Departamento de Justicia, Departamento de la Familia y Junta de Reestructuración y Estabilización Fiscal<br><br>Peticionarios | CT-2009-4<br>cons. con<br>CT-2009-5<br>CT-2009-6<br>CT-2009-9 | Certificación |

Voto Explicativo emitido por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 19 de febrero de 2010.

**Cuando el derecho se sustenta en la razón y en el ordenamiento jurídico, no hay nada más que decir. Nuestra opinión disidente emitida el 2 de febrero de 2010 es clara y no deja margen a dudas para concluir, como lo hice, que el Capítulo III de la Ley Núm. 7 de 9 de marzo de 2009, según emendada,[99] es inconstitucional desde su faz hasta su aplicación.** Sin embargo, me veo en la obligación de aclarar algunas apreciaciones equivocadas sobre mi opinión disidente que se presentan en el Voto Particular que hoy

---

[99] Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico.

emite el compañero Juez Asociado Rivera Pérez, al cual se han unido el compañero Juez Asociado Martínez Torres, la compañera Jueza Asociada Pabón Charneco y el compañero Juez Asociado Kolthoff Caraballo.

Mi conclusión respecto a que el Capítulo III de la Ley Núm. 7 de 2009 es inconstitucional de su faz es fácilmente constatable. Basta con observar el texto de la medida. Es evidente que este capítulo contiene más de un asunto distinto a la reducción de la nómina gubernamental que se anuncia en el título del estatuto. Además, aun concediendo, para efectos del análisis, que el Capítulo III atiende un solo asunto, el mismo no se anuncia claramente en el título de la ley. Esto, como discutí en mi opinión disidente, es una clara violación al Artículo III, sección 17 de nuestra Constitución.[100]

Por otro lado, mi conclusión de que el Capítulo III de la Ley Núm. 7 de 2009 es inconstitucional en su aplicación, por violentar el debido proceso de ley procesal constitucional y la cláusula de menoscabo de las obligaciones contractuales, tiene justificación jurídica en dos consideraciones.

Primero, los expedientes de los casos contenían las cartas de cesantías que fueron notificadas a los empleados cesanteados. De éstas se podía claramente observar que la

---

[100] Artículo III, sección 17, Const. E.L.A., 1 L.P.R.A. sec. 17.

notificación era defectuosa porque no incluía la causa de la cesantía ni la prueba que tenía el patrono para validar los despidos. Por ejemplo, no se aludía a la antigüedad correspondiente al empleado cesanteado con relación a otros, no se describía el plan de cesantía y mucho menos se describía el método que se utilizó para implementarlo. Esta ausencia de información provocó que el trabajador no tuviera una oportunidad real de ser oído y mucho menos la opción de defenderse. La "vista previa" a la cesantía provista por el estatuto no subsana esto pues sólo permite cuestionar la determinación de antigüedad, imposibilitando así que el empleado pudiera impugnar su cesantía con relación a la de otros empleados cesanteados o cuestionar la misma por razón de otros asuntos. Ante este panorama, no se puede menos que concluir que la vista previa a la cesantía es un mecanismo puramente pro-forma.

Segundo, ante la alegación de que la Ley Núm. 7 de 2009 violenta la cláusula constitucional de menoscabo de las obligaciones contractuales, en términos del contrato de trabajo individual y colectivo, y la aceptación de la mayoría de que este menoscabo es severo, le corresponde al Estado el peso de la prueba para establecer la razonabilidad y la necesidad de la medida.[101] El Estado no pudo cumplir con estos requisitos porque no tuvo la

---

[101] Véase: United States Trust Co. v. New Jersey, 431 U.S. 1 (1977); Bayrón Toro v. Serra, 119 D.P.R. 605 (1987).

oportunidad de presentar prueba. De los expedientes de los casos no surge prueba que sustente que el menoscabo de estos contratos, aunque severo, es razonable y necesario. Esto desde la óptica de que no existían métodos menos onerosos para reducir el gasto de la nómina gubernamental y atender la crisis fiscal del país. Ante esta realidad, requerir prueba de la inconstitucionalidad del estatuto es, como menos, innecesario.

A su vez, la ausencia de prueba sobre la razonabilidad y necesidad de la medida se debió a que no se siguió el proceso judicial ordinario, es decir, no se aprovechó la oportunidad de presentar prueba y contar con la adjudicación inicial del Tribunal de Primera Instancia y la revisión del Tribunal de Apelaciones. En fin, los expedientes no estaban completos por causa de la certificación apresurada de estos casos. Todas estas consideraciones no permiten sostener la determinación de constitucionalidad de la Ley Núm. 7 de 2009 a la cual llegó la mayoría de este Tribunal, máxime cuando se encontraba en juego el derecho constitucional que los empleados públicos tienen a su puesto, producto de la normativa laboral y de su contrato de trabajo individual y colectivo.

Al analizar si la Ley Núm. 7 de 2009 viola la cláusula de menoscabo de las obligaciones contractuales, uno de los aspectos centrales, más allá de si existe la crisis fiscal, es examinar si el Estado utiliza la alegada crisis para validar el uso de medios onerosos, como el despido masivo

de empleados públicos y la suspensión de derechos contenidos en la legislación laboral y en los convenios colectivos. Para determinar si la medida es razonable y necesaria, como expuse en mi opinión disidente, el Tribunal Supremo federal ha señalado que no se le debe otorgar completa deferencia al análisis que realice la Legislatura sobre estos dos criterios. Esto porque existe un claro conflicto de interés.

No se trata de que el Tribunal Supremo federal reconozca y mucho menos que postule "como necesario conceder, alguna deferencia a la actuación estatal",[102] como equivocadamente expone el compañero Juez Asociado Rivera Pérez. Esta apreciación no es del alto foro federal, sino que ha sido el resultado de la interpretación que le han dado algunos tribunales federales apelativos a la doctrina sobre la deferencia que se debe otorgar a la actuación legislativa cuando se menoscaban contratos públicos. Sobre este punto, es necesario dejar claro, como señalé en mi opinión disidente, que es permisible referirse a jurisprudencia federal apelativa para propósitos de persuasión. Lo que es impermisible es que se utilice esa jurisprudencia para resolver de manera contraria al mínimo que exige el Tribunal Supremo federal. En fin, este Tribunal burló la norma de no dar "completa deferencia" establecida por el Tribunal Supremo federal, cuando le otorgó total deferencia a la exposición de motivos de la

---

[102] Voto particular del Juez Asociado Rivera Pérez, pág. 48.

Ley Núm. 7 de 2009, que es lo mismo que darle completa deferencia a las alegaciones del Estado.

Aprovecho para reiterar mi criterio completamente contrario al de los compañeros que suscribieron la Opinión del Tribunal en este caso, así como el voto particular al que nos hemos referido, en lo que respecta a la naturaleza del derecho propietario de los empleados públicos sobre sus puestos de trabajo. Aduce la Opinión, e insiste el Voto Particular, que no se trata de un derecho adquirido porque la Ley Núm. 184 del 3 de agosto de 2004, según enmendada,[103] y sus predecesoras, incorporara un debido proceso de ley para cesantear trabajadores por motivo de falta de fondos o trabajo. Al contrario, esta consideración fortalece nuestra conclusión porque hace evidente que el derecho adquirido al puesto no es producto de una mera expectativa, sino que surge de todo el andamiaje que representa la administración de personal público y, en específico, de un contrato de trabajo en el que se acuerdan la extensión y alcance del mismo.

Mi llamado a la mesura responde, precisamente, a que estos trabajadores tienen un derecho adquirido sobre sus puestos, protegido constitucionalmente, y por el daño que una determinación sin justificación jurídica ni prueba puede ocasionarle a éstos, a sus respectivas familias, a la economía y a la sociedad en general. Este reclamo de

---

[103] Este estatuto se conoce como Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico.

mesura no es caprichoso y no hace daño a nadie. Contrariamente, la determinación de este Tribunal le ha ocasionado daño a miles de seres humanos. Este reclamo recoge, además, la directriz del Tribunal Supremo federal, en United States Trust Co. v. New Jersey, que impone la obligación de escoger "a more moderate course" cuando éste sea adecuado.[104] Un ejemplo de mesura y de las medidas menos onerosas a las que se refiere el Tribunal Supremo federal es la decisión tomada por el Departamento de Educación de restituir en sus puestos, el 11 de febrero de 2010, a 1,784 conserjes. Éstos representan el 51% de los 3,489 conserjes a los cuales se les había dado cartas de cesantías y que ya no estaban trabajando.[105] La Autoridad Nominadora del Departamento de Educación optó por negociar con el sindicato métodos menos onerosos, como la reducción de 5% del salario y medio día de la jornada de trabajo, para atender el problema fiscal de la agencia. En otras palabras, se enfrentó la crisis fiscal sin recurrir a medidas extremas que violentaran los derechos constitucionales de los trabajadores y quebraran la estabilidad laboral, política y social de nuestro país.

---

[104] United States Trust Co. v. New Jersey, supra, pág. 31. Claro que para determinar que no procede la acción más moderada y que el curso de acción debe ser más drástico es necesario recibir prueba del Estado.

[105] Puerto Rico Daily Sun, "Education, SPT agree to save 1,784 jobs, 4005 workers to be fired" por Xavira Neggers Crescioni, Saturday, February 11, 2010; El Nuevo Día, "Retienen sus empleos 1,784 conserjes escolares: Trabajarán media hora menos y sus salarios se reducirán en un 5%" por Sandra Caquías Cruz, 11 de febrero de 2010.

Finalmente, el compañero Juez Asociado Rivera Pérez plantea que en otras ocasiones este Tribunal ha tomado conocimiento judicial de la crisis fiscal del país, sin prueba en el expediente y basando su determinación exclusivamente en el texto de la ley. Para sustentar su argumento alude a los casos Presidente de la Cámara v. Gobernador,[106] Díaz Saldaña v. Gobernador[107] y Romero Barceló v. E.L.A.[108] Cada uno de estos casos es claramente distinguible de la controversia sobre las cesantías masivas de empleados públicos ocasionadas por la política pública que establece la Ley Núm. 7 de 2009.

La controversia del primer caso surgió cuando el Hon. Aníbal Acevedo Vilá, entonces Gobernador de Puerto Rico, redujo el presupuesto de la Rama Legislativa, lo que provocó que el Hon. José Aponte Hernández, anterior Presidente de la Cámara de Representantes, presentara una demanda alegando que la actuación del Gobernador era inconstitucional porque estaba en contra de la doctrina de separación de poderes. Por su parte, la controversia del segundo caso se originó cuando el licenciado Acevedo Vilá le emitió una instrucción al Hon. Juan Carlos Méndez Torres, Secretario de Hacienda, para que sólo se le autorizara al Hon. Manuel Díaz Saldaña, Contralor de Puerto

---

[106] Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006).

[107] Díaz Saldaña v. Gobernador, 168 D.P.R. 359 (2006).

[108] Romero Barceló v. E.L.A., 169 D.P.R. 460 (2006).

Rico, el desembolso del 75% de los gastos de nómina y otros gastos operacionales de la Oficina del Contralor para los meses de mayo y junio del 2006. Ante esta actuación, el contralor Díaz Saldaña sometió ante este Tribunal un recurso de *mandamus*.

El tercer caso surgió cuando el Hon. Carlos Romero Barceló y el Sr. Peter Muller Maldonado, en calidad de contribuyentes afectados, presentaron una demanda sobre sentencia declaratoria impugnando la alegada interpretación errónea que la Rama Ejecutiva había realizado del impuesto sobre las ventas y el uso que establecía la Ley de Justicia Contributiva de 2006. La Rama Ejecutiva interpretó que la tasa contributiva era de 5.5% para el Estado y de 1.5% para los municipios, para un impuesto total máximo sobre las ventas y el uso de un 7%. Mientras, los demandantes planteaban que esta interpretación era equivocada y que procedía establecer una tasa contributiva de 4% estatal y un 1.5% municipal.

Como puede observarse, cada uno de estos casos acontecieron en un contexto donde existía un conflicto entre dos ramas de poder, la legislativa y la ejecutiva. Además, los primeros dos casos no se resolvieron en sus méritos, no porque este Tribunal declinara ejercer su función judicial, como expone el compañero Juez Asociado Rivera Pérez, sino más bien porque la ejerció para concluir, luego de un ponderado análisis jurídico, que no debíamos asumir jurisdicción. Específicamente, en el primer

caso nos abstuvimos de resolver la controversia por cuestiones de justiciabilidad, fundamentada en la doctrina constitucional de academicidad, porque el Gobernador había aprobado una orden ejecutiva para desembolsar las asignaciones presupuestarias de la Rama Legislativa. Fue únicamente en este contexto que expresamos que "parece evidente que la condición fiscal del país no es la misma que existía cuando el Gobernador decidió reducir los aludidos presupuestos."[109] Mientras, en el segundo caso decidimos denegar la expedición del *mandamus*, que es un recurso de carácter discrecional, porque la controversia había sido resuelta entre la Rama Ejecutiva y Legislativa. En ese contexto expresamos:

…tomamos conocimiento judicial de que al ser aprobada la Ley para el Financiamiento del Déficit Gubernamental del 2006, supra, y la Resolución Conjunta Núm. 119 de 13 de mayo de 2006, entre otras piezas legislativas, cesaron aquellas razones aducidas por el Gobernador en su Orden Ejecutiva para ordenar el desembolso limitado de los gastos de la Oficina del Contralor.[110]

En cuanto al tercer caso, que sí se resolvió en sus méritos, nunca hicimos expresión alguna sobre la crisis fiscal del país, ni mucho menos sustentamos nuestra determinación en ésta. Lo más cercano a eso fue lo siguiente:

Es de conocimiento público que la Rama Ejecutiva ha tomado las medidas necesarias para la imposición de un impuesto estatal a una tasa contributiva de un 5.5%, la cual a partir del 15 de noviembre de 2006 se unirá a una tasa contributiva de 1.5% correspondiente al

---

[109] Presidente de la Cámara v. Gobernador, supra, pág. 159.

[110] Díaz Saldaña v. Gobernador, supra, pág. 368.

impuesto municipal. La reglamentación necesaria por parte del Departamento de Hacienda ya ha sido aprobada. Sólo resta la llegada de la fecha de vigencia de la Ley de la Justicia Contributiva de 2006, a saber, el 15 de noviembre de 2006, para que ésta entre en vigor, según ha sido interpretada por la Rama Ejecutiva. Tanto la aprobación como la vigencia de la mencionada pieza legislativa es definitiva y su inminente aplicación reviste de concreción y de madurez a la reclamación presentada por los demandantes-peticionarios.[111]

Estas expresiones fueron producto del análisis jurídico que realizamos para determinar si la controversia estaba madura para ser resuelta. Luego de esta ponderación, concluimos que la controversia estaba madura y procedimos a interpretar la Ley de la Justicia Contributiva de 2006. Como puede observarse, tanto este caso como los primeros dos planteaban cuestiones exclusivamente de derecho, por lo cual era innecesario, contrario a lo que afirma el compañero Juez Asociado Rivera Pérez, que se presentase prueba y que este Tribunal se basara en ésta para adjudicar la controversia. De todas formas, los juicios sobre actuaciones del pasado no pueden ser el fundamento para decisiones tomadas en el presente.

Ninguna de estas previas decisiones afectó derechos constitucionales de los ciudadanos, ni mucho menos dejaron sin sustento a miles de trabajadores puertorriqueños, con sus respectivas familias. Esto es distinto a la actuación de la mayoría de este Tribunal en este caso, que tomó conocimiento de la alegada crisis fiscal del país de $3,200 millones y de que la única opción viable para atenderla era

---

[111] Romero Barceló v. E.L.A., supra, pág. 476.

la cesantía masiva de empleados públicos, sin prueba en el expediente y basándose exclusivamente en la exposición de motivos de la Ley Núm. 7 de 2009, es decir, en las alegaciones del Estado.

Nuestro pueblo merece un Tribunal que respete profundamente las leyes y tradiciones que fundamentan nuestra cultura de trabajo. No necesita un Tribunal que adjudica una controversia con un expediente huérfano de prueba, sólo a base de las alegaciones, cuando están en juego los derechos constitucionales de miles de ciudadanos.


Liana Fiol Matta
Jueza Asociada